658 F.2d 279
 UNITED STATES of America, Plaintiff-Appellee,
v.
Raymond Eugene HAWKINS, Carlos Gerdes, a/k/a Carlos San
Ramon, James Louis Holland, Martin Marion Sneed,
Jr., Clyde E. Sneed and Clifford J.
Swiere, Defendants-Appellants.
 No. 79-5617.
 United States Court of Appeals,
Fifth Circuit.
 Unit A
Sept. 21, 1981.
 
 John H. Hannah, Jr., U. S. Atty., Tyler, Tex., David P. Baugh, Asst. U. S. Atty., Beaumont, Tex., William C. Bryson, Washington, D. C., for plaintiff-appellee.
 James W. Lawson, Joseph S. Oteri, Judith H. Mizner, Boston, Mass., for Hawkins.
 Gerald H. Goldstein, Mark Stevens, San Antonio, Tex., for Gerdes.
 David B. Bonham, Groves, Tex., for Holland.
 Stephen M. Rienstra, Port Arthur, Tex., for Martin M. Sneed, Jr., and Clyde E. Sneed.
 Louis Dugas, Jr., Orange, Tex., for Swiere.
 Appeals from the United States District Court for the Eastern District of Texas.
 Before WISDOM, RUBIN and SAM D. JOHNSON, Circuit Judges.
 SAM D. JOHNSON, Circuit Judge:
 
 
 1
 In this case, six defendants appeal convictions and sentences received following a trial on a July 10, 1979 multiple-count indictment charging violations of, inter alia, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq. (counts 1-7); possession of marijuana with intent to distribute, 21 U.S.C. § 841(a)(1) (counts 8-11); importing a controlled substance into the United States, 21 U.S.C. §§ 952, 960(a)(1) (counts 12, 13); engaging in a continuing criminal enterprise, 21 U.S.C. § 848 (counts 14-17); and travelling in interstate commerce with intent to promote the smuggling, possession and distribution of marijuana, 18 U.S.C. § 1952 (counts 18-23).[1]
 
 
 2
 In essence, the indictment alleged that appellants participated in an ongoing enterprise involving the smuggling from Colombia to Texas of large quantities of marijuana on four shrimp boats. Specifically, the indictment alleged that, using the shrimp boats, appellants arranged for five shipments to be smuggled into Texas, where the marijuana was unloaded on trucks for transportation to various distribution points. Although the indictment charged each of the six appellants with participation in the overall RICO conspiracy, appellants were not each alleged to have actually participated in each of the five shipments.
 
 
 3
 Although several of the issues presented in this appeal are applicable only to a single appellant, many issues are common to two or more appellants. Because of our disposition of these "common" issues, it is unnecessary to address several of the additional arguments raised by the individual appellants.
 
 
 4
 I. Pretrial Publicity Hawkins, Holland, Martin Sneed, Jr., Clyde Sneed
 
 
 5
 As the government conceded both in its brief and at oral argument, this case attracted a significant amount of local coverage by the news media. The alleged conspiracy was described in the local media as the "Texas Conspiracy," and was reported on numerous occasions to be one of the largest illegal drug operations in the history of the State of Texas. On the basis of the publicity surrounding the case, appellants filed pretrial motions requesting, inter alia, examination of each potential juror who had been exposed to the publicity. These motions were denied.
 
 
 6
 At the voir dire of the panel members, the district court inquired of the panel en masse
 
 
 7
 (i)f any of you have heard about this case, or have read about it in the newspaper, or heard it on TV or the radio, or have talked with anyone, which has caused you to form an opinion as to the guilt or innocence of the Defendants, and if that is such an opinion as would affect you if selected as a Juror, if so, may I see your hand?
 
 
 8
 No panel members responded, and the court then stated that
 
 
 9
 I presume then, that none of you know enough about the case or heard enough about it that you feel that it would keep you from being a fair and impartial Juror or would affect or influence your verdict.
 
 
 10
 T. 14:24. During voir dire by counsel, however, forty-eight of the fifty-six members of the panel, or eighty-six percent of the potential jurors, responded affirmatively to a request for "a show of hands of everyone who has heard or read on the news media, in the newspapers, on the television or radio, or from other individuals, anything about this case." T. 14:90. In light of this response, defense counsel renewed the request for individual examination of the panel members.[2] In denying appellants' request, the district court explained:
 
 
 11
 (I)t would be improper as an unnecessary question, in the Court's opinion, to ask them what they heard, because that is insignificant and not important. The question is whether or not they have heard anything or know anything about the case, which would cause them to form an opinion, that would affect them if selected as a Juror in the case. So your request is denied.
 
 
 12
 T. 14:97.
 
 
 13
 A criminal defendant is entitled to an impartial jury that will render a verdict based exclusively upon the evidence presented in court and not on outside sources. Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); United States v. Gerald, 624 F.2d 1291, 1296 (5th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). Exposure to pretrial publicity, however, does not necessarily destroy a juror's impartiality. Calley v. Callaway, 519 F.2d 184, 205-06 (5th Cir. 1975) (en banc), cert. denied, 425 U.S. 911, 95 S.Ct. 1505, 47 L.Ed.2d 760 (1976). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based upon the evidence presented in court." Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643 (citations omitted).
 
 
 14
 Rule 24(a) of the Federal Rules of Criminal Procedure gives the district court broad discretion in determining the appropriate scope and method of jury voir dire. United States v. Magana-Arevalo, 639 F.2d 226, 228 (5th Cir. 1981); United States v. Gerald, 624 F.2d at 1296. The court's discretion extends both to the decision whether to propound questions proffered by counsel and whether jurors should be questioned collectively or individually out of the presence of other jurors. Id.; United States v. Shavers, 615 F.2d 266, 268 (5th Cir. 1980); United States v. Delval, 600 F.2d 1098, 1102 (5th Cir. 1979). This broad discretion, however, is limited by the requirements of due process, and the reviewing court must independently evaluate the voir dire testimony of empanelled jurors, as well as the record as a whole, and determine whether the method of voir dire adopted by the district court is capable of giving "reasonable assurance that prejudice would be discovered if present." United States v. Delval, 600 F.2d at 1102, quoting United States v. Nell, 526 F.2d 1223, 1229 (5th Cir. 1976). The district court's decision will "not be lightly overturned." United States v. Carroll, 582 F.2d 942, 946 (5th Cir. 1978).
 
 
 15
 The facts of the case sub judice are strikingly similar to those presented in United States v. Davis, 583 F.2d 190 (5th Cir. 1978). Before trial, the defendant in Davis brought to the district court's attention the scope, which was extensive, and substance of much of the local news coverage that the case attracted. The defendant also filed a motion requesting an individual examination of every panel member exposed to the publicity to determine the extent, frequency, and harmfulness of the exposure. Although the district court determined that every panel member had been exposed to some of the publicity, the court denied defendant's request to examine the panel members individually. Instead, the court inquired of the panel en masse whether any member felt that the publicity impaired their ability to render an impartial decision. 583 F.2d at 196 n.5. None responded.
 
 
 16
 Noting that the nature and extent of the local coverage in Davis raised a significant possibility of jury prejudice, this Court held that the district court erred in failing to undertake a more thorough examination of the panel members: "Under the circumstances of this case, where the nature of the publicity as a whole raised a significant possibility of prejudice, the cursory questioning by the court was not enough. The court should have determined what in particular each juror had heard or read and how it affected his attitude toward the trial, and should have determined for itself whether any juror's impartiality had been destroyed." 583 F.2d at 196. Specifically, the Court cited with approval the ABA Standards Relating to Fair Trial and Free Press,[3] which recommend that, in these circumstances, the district court examine each juror apart from the other jurors to determine what the juror read and how it affected the juror's attitudes toward the trial. This Court stopped short, however, of holding in Davis that separate examination of each juror is always required. Recognizing "the district court's need for flexibility in interrogating jurors as to possible prejudice," 583 F.2d at 197, the Court simply held that, under the circumstances of that case, "the district court did not make significant inquiry into the possibility of prejudice and did not reach its own independent determination whether the impartiality of any juror had been destroyed." Id. at 198.
 
 
 17
 In United States v. Gerald, 624 F.2d 1291, 1297 (5th Cir. 1980), fifteen of twenty-eight prospective jurors were exposed to pretrial publicity. Although this Court reaffirmed the principle stated in Davis that cursory questioning of the jury is not enough when the nature of the publicity as a whole, together with the surrounding circumstances, raises a significant possibility of prejudice, we noted that, unlike Davis, the record in Gerald was "completely devoid of any indicators of the nature and extent of pretrial publicity ...."[4] 624 F.2d at 1297. Consequently, this Court held that defendant's failure in Gerald to "direct the trial court's attention to specific news items so the trial court (could) make an initial determination of whether the information is prejudicial," 624 F.2d at 1298, defeated his claim that the district court erred in failing to adhere to the strict requirements of Davis :
 
 
 18
 The time consuming, probing, preferably individual voir dire described in Davis generally is not required in cases involving unsupported general allegations of prejudicial pretrial publicity or in cases where the publicity does not create a significant potential of prejudice.
 
 Id. (citations omitted).[5]
 
 19
 In the case sub judice, appellants filed with the district court copies of over forty articles appearing in local Beaumont, Texas newspapers, as well as transcripts of several television reports, all relating to the arrests, indictments, and pre-trial activities surrounding this case. Although conceding that the indictment and subsequent trial of appellants "attracted a significant amount of local coverage" by the new media, the government argues that the publicity did not raise the "significant possibility of prejudice" present in Davis. Even the most cursory examination of the newspaper articles filed with the district court, however, refutes this argument. The drug-related nature of the charges against appellants commanded prominence in the vast majority of the local coverage, as did the government's allegation of a large, ongoing conspiracy involving over twenty individuals. Several of the articles referred to the racketeering and criminal enterprise charges, and appellants' names were repeated in virtually all of the major articles. On at least one occasion the first page of the indictment, bearing appellants' names, was reproduced prominently, as was a photograph of the shrimping vessels seized by the government. The fact that an assortment of weapons was found on one of the vessels also was reported, as was speculation attributed to federal sources that a government witness might have been killed in retaliation. Many of the articles repeated the allegation that the operation was responsible for smuggling over 170 tons of marijuana over a several month period. Moreover, as noted supra, the local media referred to the case, with some hyperbole, as the "Texas Conspiracy."
 
 
 20
 Perhaps of equal concern to appellants was the almost continuous flow of local newspaper articles reporting the guilty pleas and sentencing of various other defendants in the case. Unlike many of the articles relating to the indictment and initial arrests, these articles continued to appear up to and during appellants' trial. Particularly in a case involving charges of conspiracy, criminal enterprise and racketeering, the potential prejudice flowing from articles of this nature should be considered.
 
 
 21
 Finally, appellants point to the massive publicity, both local and statewide, that followed the assassination of Federal District Judge John H. Wood, Jr. of San Antonio. Although, as noted supra,[6] publicity concerning events or persons not actually involved in the trial will not ordinarily trigger the necessity of the procedures endorsed in Davis, appellants correctly note that the "connection" between the Wood case and the case sub judice was provided by the local news media. At least two articles appeared in local newspapers that attributed to local federal marshals the statement that, in light of the assassination of Judge Wood, which was widely speculated to be the work of underworld drug figures, security in the trial of appellants would be enhanced to protect federal officials.[7]
 
 
 22
 As in Davis, this Court is compelled to conclude that, in light of the nature and extent of the pretrial publicity surrounding this case, and the fact that forty-eight of the fifty-six potential jurors acknowledged some exposure to the publicity, the district court's abbreviated treatment of this issue simply does not afford "a reasonable assurance that prejudice would (have been) discovered if present." United States v. Delval, 600 F.2d at 1102, quoting United States v. Nell, 525 F.2d at 1229. Contrary to the district court's observation that a specific inquiry into what each affected juror had read or heard was "insignificant and not important," the clear teaching of Davis is that, when a significant possibility exists that a juror will be ineligible to serve because of potentially prejudicial publicity, it is the obligation of the district court to determine whether that juror can lay aside any impression or opinion due to the exposure. Of course, this does not mean that every case involving exposure to pretrial publicity automatically requires the "time consuming, probing, preferably individual voir dire described in Davis," United States v. Gerald, 624 F.2d at 1298; nor does it mean that such an examination, when necessary, must always be conducted apart from the other jurors. As in Davis, "(w)e recognize the district court's need for flexibility in interrogating jurors as to possible prejudice." 583 F.2d at 197. What it does mean, however, is that when the nature of the publicity as a whole raises a significant possibility of prejudice, and a juror acknowledges some exposure to that publicity, more than the abbreviated questioning conducted in Davis and in the case sub judice is necessary: "The juror is poorly placed to make a determination as to his own impartiality. Instead, the trial court should make this determination." 583 F.2d at 190. Consequently, our conclusion that the district court's inquiry was, under Davis, insufficient to reveal possible juror prejudice, requires reversal of the convictions of appellants Hawkins, Holland, Martin Sneed, Jr. and Clyde Sneed.
 
 
 23
 II. Consecutive Sentences for Substantive RICO Count and Predicate Offenses Gerdes
 
 
 24
 Appellant Gerdes received consecutive sentences on his substantive RICO conviction, 18 U.S.C. § 1962(c),[8] and the substantive drug charges on which he was convicted.[9] Because these substantive drug charges three counts of possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1), and one count of importation of marijuana in violation of 21 U.S.C. §§ 952 and 960(a)(1) also were alleged in the indictment as the "predicate offenses" which form the "pattern of racketeering activity" necessary to sustain his conviction under the substantive RICO count, Gerdes argues that the district court's imposition of consecutive sentences for the RICO conviction and the "predicate offenses" violated the double jeopardy clause of the Constitution, and that the sentences imposed on the predicate offenses should be vacated.[10]
 
 
 25
 In Whalen v. United States, 445 U.S. 684, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980), the Supreme Court recently had occasion to readdress the double jeopardy implications of imposing multiple punishments in a single criminal proceeding. Although proceeding from the well-established principle that "(t) he Fifth Amendment guarantee against double jeopardy protects not only against a second trial for the same offense, but also 'against multiple punishments for the same offense,' " 100 S.Ct. at 1436, quoting North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969), the Court recognized that because "the power to define criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them, resides wholly with the Congress," citing United States v. Wiltberger, 5 Wheat. 76, 95, 5 L.Ed. 37; United States v. Hudson & Goodwin, 7 Cranch 32, 34, 3 L.Ed. 259,[11] "(t)he question whether punishments imposed by a court after a defendant's conviction upon criminal charges are unconstitutionally multiple cannot be resolved without determining what punishments the Legislative Branch has authorized." 100 S.Ct. at 1436 (citations omitted). Concluding that "(t)he Double Jeopardy Clause at the very least precludes federal courts from imposing consecutive sentences unless authorized by Congress to do so," the Court phrased the "dispositive question" as whether Congress intended to provide for multiple punishments. Id.[12]
 
 
 26
 In Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the Supreme Court established a test for determining whether Congress has in a given situation provided that two statutory offenses may be punished cumulatively:
 
 
 27
 The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not.
 
 
 28
 52 S.Ct. at 182. In the case sub judice, Gerdes argues that because the four substantive drug charges of which he was convicted also were alleged as "predicate crimes" under the RICO count, they do not "require proof of a fact which the (substantive RICO offense) does not," id., and those predicate offenses therefore are the "same offense" as the RICO count. Consequently, Gerdes argues that, under Blockburger, the double jeopardy clause prohibits consecutive sentences for the predicate crimes and the substantive RICO offense.[13]
 
 
 29
 This argument cannot be sustained. Gerdes' assumption that Blockburger defines the scope of the double jeopardy clause misconceives the purpose and nature of that rule: Blockburger is not a constitutional "litmus test" for determining whether a particular sentence violates the double jeopardy clause. Rather, as the Supreme Court made clear in Whalen, Blockburger is "a rule of statutory construction ... relied on ... to determine whether Congress has in a given situation provided that two statutory offenses may be punished cumulatively." 100 S.Ct. at 1438 (footnote omitted). As noted supra, the essential inquiry is Congress' intent. See 100 S.Ct. at 1436.
 
 
 30
 After careful examination of the statutory scheme of RICO, as well as the relevant legislative history, we agree with our sister circuits that have considered the question that, in enacting RICO, Congress intended to permit cumulative sentences for substantive RICO offenses and the underlying predicate offenses. As the Ninth Circuit observed in United States v. Rone, 598 F.2d 564, 571 (9th Cir. 1979) cert. denied sub nom., 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980):
 
 
 31
 There is nothing in the RICO statutory scheme which would suggest that Congress intended to preclude separate convictions or consecutive sentences for a RICO offense and the underlying or predicate crimes which make up the racketeering pattern. The racketeering statutes were designed primarily as an additional tool for the prevention of racketeering activity, which consists in part of the commission of a number of other crimes. The Government is not required to make an election between seeking a conviction under RICO, or prosecuting the predicate offenses only. Such a requirement would nullify the intent and effect of the RICO prohibitions.
 
 
 32
 Accord United States v. Boylan, 620 F.2d 359 (2d Cir. 1980) cert. denied, --- U.S. ----, 101 S.Ct. 103, 66 L.Ed.2d 38 (1981); United States v. Aleman, 609 F.2d 298 (7th Cir. 1979) cert. denied, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). This conclusion is supported by legislative history. In enacting RICO, Congress stated its intent as follows:
 
 
 33
 It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.
 
 
 34
 Congressional Statement of Findings and Purpose, Pub.L. 91-452 § 1 (emphasis added). As the Ninth Circuit noted in Rone, a congressional intent to proscribe cumulative sentences for a RICO count and the underlying predicate offenses is fundamentally inconsistent with Congress' stated purpose to establish "new penal prohibitions" for racketeering: "If the RICO sentence must run concurrently with a sentence for any predicate crime, there would be no 'enhanced' penalties." 598 F.2d at 572.
 
 
 35
 Evidence of Congress' intent also is found in section 904(b), which provides that "(n)othing in this title shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this title." Pub.L. 91-452 § 904(b). This admonition is to be read in light of section 904(a), which provides that "(t) he provisions of this title shall be liberally construed to effectuate its remedial purposes." Pub.L. 91-452 § 904(a).
 
 
 36
 Additional evidence of Congress' intent is found in the statutory scheme of RICO. Section 1961(5) provides that a
 
 
 37
 "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.
 
 
 38
 (emphasis added). As noted in United States v. Aleman, 609 F.2d at 306, and United States v. DePalma, 461 F.Supp. 778, 786-87 (S.D.N.Y.1978), this language indicates that Congress intended to allow a RICO conviction to be based in part upon a predicate crime for which the defendant already has been convicted and has served a sentence. If this interpretation is correct, it does not appear likely that Congress would have intended to prohibit the imposition of cumulative punishments in the same criminal proceeding. In light of the foregoing, we conclude that Congress has manifested in clear and unequivocal terms its intention to permit cumulative punishments in these circumstances.
 
 
 39
 Even absent any evidence of legislative intent, it is questionable that Blockburger would compel a finding that, in enacting RICO, Congress intended to prohibit consecutive sentences for the substantive RICO offense and the underlying predicate crimes. As the Second Circuit noted in Boylan, the Blockburger rule only applies when the "same act or transaction" constitutes a violation of two distinct statutory provisions. 620 F.2d at 361. The difficulty with applying this concept to the RICO statute is self-evident: unlike traditional greater and lesser included offenses, such as armed robbery and robbery, or aggravated rape and rape, which arise in fact from the "same act or transaction," RICO and the underlying predicate offenses do not.[14] Indeed, as noted supra, a RICO conviction may be based in part upon a predicate offense for which the defendant has already been convicted and served a sentence. Although we recognize that it might be argued that the "same act or transaction" requirement of Blockburger should, as in cases involving traditional greater and lesser included offenses, simply be interpreted as coextensive with the scope of the predicate offense, we need not decide this question. It is enough to conclude that, in light of the clear intent of Congress to authorize cumulative punishments for substantive RICO offenses and the underlying predicate crimes, Blockburger, which simply is a tool for divining Congress' intent in the absence of other evidence, does not compel a contrary result. Consequently, the district court did not err in imposing consecutive sentences in Gerdes' case.
 
 III. Other Issues
 A. In-Court Identification Swiere
 
 40
 Appellant Swiere claims that the evidence was insufficient to support his conviction. In particular, he asserts that government witness Willis Judge Butler's in-court identification of Swiere was uncertain, and that Butler's testimony concerning Swiere's participation in the smuggling operation therefore was insufficient to support a conviction. Consequently, Swiere argues that the district court erred in denying his motions to strike Butler's testimony and for a judgment of acquittal.
 
 
 41
 Contrary to Swiere's claim, the evidence against him was sufficient to take the case to the jury. At trial, Butler identified Swiere by name as one of the persons involved in the shipment brought in on the vessel BAYOU BLUES. T. 19:1638-41. Butler also testified that he had met Swiere before at Martin Sneed's shipyard. T. 19:1638. Moreover, Butler testified that Swiere was acting in a supervisory capacity during the unloading process, and that he gave Butler and others instructions. T. 19:1640-41. Finally, at trial Butler described Swiere as "probably 5'5 , maybe, has a limp, kind of stocky built." T. 19:1641. In closing argument, Swiere's attorney conceded that Swiere had a limp. T. 21:2223.
 
 
 42
 Despite the foregoing evidence of Swiere's involvement, Swiere argues that Butler's subsequent in-court identification of Swiere renders Butler's testimony insufficient as a matter of law. This argument cannot be sustained. Although it appears that the in-court identification was somewhat less than unequivocal,[15] Swiere's argument overlooks the principle that although an uncertain in-court identification will not support a conviction where that identification is the only evidence offered on the issue of identity, when, as here, there is other sufficient evidence of identity, the tentative nature of the in-court identification is not fatal. See United States v. Marchand, 564 F.2d 983, 985-86, 1000 & n.27 (2d Cir. 1977), cert. denied, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978); United States v. Murray, 527 F.2d 401 (5th Cir. 1976). It was for the jury to weigh the credibility of Butler's testimony, and "(i)t is not the appellate function to judge the credibility of witnesses." United States v. Murray, 527 F.2d at 410-11. Butler's in-court identification of Swiere was not the only evidence of identification presented to the jury. Butler's description of Swiere and his testimony concerning Swiere's involvement were more than sufficient to support the jury's verdict.
 
 B. The "Colombia Connection" Gerdes
 
 43
 As noted supra, appellant Gerdes pleaded guilty to six counts of the indictment. Prior to sentencing, the district court denied Gerdes' motion requesting the court "to state in writing or in the record at the time of pronouncing sentence herein the specific reasons upon which this Honorable Court has determined to impose the particular sentence in this cause," T. 3:755, and subsequently imposed a total punishment of twenty years imprisonment, eight years special parole, and a fine of $110,000. Four days after sentencing Gerdes, however, the district court granted his request that reasons be given for the sentence imposed. In the course of explaining the sentence, the district court stated that, on the basis of the evidence presented at trial and the information contained in Gerdes' pre-sentence report, it had concluded that Gerdes was "a principal leader in the conspiracy to smuggle marijuana from a foreign country, Colombia, into the State of Texas, and was instrumental in setting up what we would refer to as the Colombia connection, in obtaining the marijuana, which was loaded on the boats involved ... and was unloaded in this area." T.Supp. 4:3. On appeal, Gerdes takes issue with the district court's observation that he "was instrumental in setting up what we would refer to as the Colombia connection" on the ground that nothing in the pre-sentence report or the evidence presented at trial supports such a finding.
 
 
 44
 In light of the evidence presented at trial of Gerdes' deep supervisory and/or financial involvement in three of the five shipments of marijuana, Gerdes' argument is somewhat puzzling. Moreover, in light of Gerdes' election to plead guilty to six counts of the indictment, including charges of racketeering and importation, it cannot seriously be argued that the district court's observation that Gerdes was a principal figure in the operation was based on "surmise, misinformation (or) suspicion." See United States v. Espinoza, 481 F.2d 553, 557 (5th Cir. 1973), quoting United States v. Malcolm, 432 F.2d 809, 819 (2nd Cir. 1970).
 
 
 45
 As the Government suggests in its brief, it appears likely that Gerdes attributes to the district court's use of the term "Colombia connection" a significance that goes beyond a mere shorthand description of Gerdes' involvement in the smuggling operation as a whole, and that instead accuses Gerdes of being the individual responsible for providing the drugs in the exporting country i. e., Colombia. If the district court's comment reasonably could be interpreted in this manner, Gerdes' argument might have merit. See United States v. Espinoza, 481 F.2d at 556. We seriously doubt, however, that by use of the term "Colombia connection" the district court intended to employ the meaning attributed to that phrase by those familiar with the parlance of the drug world. By far the more reasonable and likely explanation is that the district judge simply used the term as a shorthand description of Gerdes' involvement in the smuggling operation as a whole. For this reason, Gerdes' additional argument that the district court erred in failing to provide its explanation for Gerdes' sentence until after sentencing, thereby depriving him of an effective opportunity to correct or rebut erroneous information relied upon by the court, is without merit. Because we find that the district court did not rely on erroneous information in sentencing Gerdes, there was nothing to correct or rebut. See United States v. Laurents, 564 F.2d 1178, 1179 (5th Cir. 1977); United States v. Gamboa, 543 F.2d 545, 547 (5th Cir. 1976). See also United States v. Thompson, 541 F.2d 794, 795 (9th Cir. 1976); United States v. Powell, 487 F.2d 325 (5th Cir. 1973).
 
 
 46
 For the foregoing reasons, the convictions of appellants Hawkins, Holland, Martin Sneed, Jr., and Clyde Sneed are reversed and the cases against those appellants remanded to the district court. The convictions and sentences of appellants Gerdes and Swiere are affirmed.
 
 
 47
 AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
 
 
 
 [1]
 The original 28-count indictment charged 24 individuals with one or more of the aforementioned offenses. A superseding indictment was returned on July 10, 1979. The only substantial change in that indictment affecting the appellants was the elimination of one count of travelling in interstate commerce to promote the smuggling of marijuana, originally charged against James Holland
 Prior to trial, four of the indicted co-conspirators entered guilty pleas and agreed to testify for the government. Two co-conspirators entered guilty pleas during the course of the trial, and two others were acquitted by the court at the close of the government's case. Six of the remaining defendants perfected appeals to this Court. The convictions and sentences for each of the appellants were as follows:
 Raymond Hawkins: Convicted on counts 1, 5, 8, 11, 12, and 13. Sentenced to six years imprisonment and a fine of $25,000 on each of counts 1 and 5; and two years imprisonment, a fine of $15,000 and a special parole term of two years on each of the remaining counts. All sentences were ordered to be served consecutively.
 Carlos Gerdes: Pleaded guilty to counts 1, 4, 8, 9, 10 and 12; the government then moved to dismiss count 16. Sentenced to six years imprisonment and a fine of $25,000 on each of counts 1 and 4; and two years imprisonment, a fine of $15,000 and a special parole term of two years on each of the remaining counts. All sentences were ordered to be served consecutively.
 James Holland: Convicted on counts 1, 7, 8, 9, 10, 12, and 21. Sentenced to concurrent terms of six years imprisonment and a fine of $25,000 on counts 1 and 7; two years imprisonment, a fine of $10,000 and a special parole term of three years on counts 8, 9, 10, and 12, with the sentences to run concurrently with each other but consecutively to the sentences on counts 1 and 7; two years imprisonment and a fine $7,500 on count 21, with that sentence to run consecutively to the sentences on counts 1 and 7, and counts 8, 9, 10, and 12. Holland's sentence herein also was ordered to be served consecutively to the sentence imposed in a different case.
 Martin Sneed, Jr.: Convicted on count 11; acquitted on counts 1 and 13. Sentenced to five years imprisonment, a fine of $15,000 and a special parole term of three years.
 Clyde Sneed: Convicted on count 11; acquitted on counts 1 and 13. Sentenced to three years imprisonment, a fine of $10,000 and a special parole term of two years.
 Clifford Swiere: Convicted on counts 11, 13, and 23; acquitted on count 1. Sentenced to three years imprisonment and a fine of $10,000 on count 11; and three years imprisonment, a fine of $10,000 and a special parole term of two years on counts 13 and 23. The sentences on the three counts were ordered to be served concurrently.
 
 
 [2]
 Counsel explained that "in order to adequately inquire and exercise our peremptory, as well as our challenges for cause, it will be necessary for us to inquire of these Jurors what it was they heard, because some of the newspaper reports contain things which, pursuant to our Pre-Trial Motions, we are concerned about." T. 14:95-96
 
 
 [3]
 "Whenever there is believed to be a significant possibility that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to his exposure shall take place outside the presence of other chosen and prospective jurors. An accurate record of this examination shall be kept, by court reporter or tape recording whenever possible. The questioning shall be conducted for the purpose of determining what the prospective juror has read and heard about the case and how his exposure has affected his attitude towards the trial, not to convince him that he would be derelict in his duty if he could not cast aside any preconceptions he might have." Section 3.4(a) (Approved Draft 1968)
 
 
 [4]
 The only suggestion contained in the record in Gerald of the nature or extent of pretrial publicity was the statement of the district court to the panel:
 There has been publicity on this case, as we all know, in the newspapers; it was reported in the news media from time to time ....
 624 F.2d at 1297.
 
 
 [5]
 Similarly, in United States v. Magana-Arevalo, 639 F.2d 226 (5th Cir. 1981), this Court held that the strict requirements of Davis are not necessary when the pretrial publicity does not "concern events or persons actually involved in the trial." 639 F.2d at 229
 
 
 [6]
 See note 5, supra
 
 
 [7]
 An article appearing on June 11, 1979 reported that
 Federal marshals said extra security precautions will be taken this week to insure against any danger to federal officials involved in the prosecution of the drug case.
 Additional security was prompted by the assassination of U.S. District Judge John H. Wood, Jr. of San Antonio on May 29. Wood was assigned to a major drug case in West Texas.
 Similarly, an article published the following day reported that
 Federal marshals planned extra security precautions to insure against any danger to federal officials involved in the prosecution of the drug case.
 Although the potential impact of the above-quoted articles was lessened by the three-month span between their publication and the beginning of appellants' trial, the possibility of juror prejudice cannot altogether be ignored.
 
 
 [8]
 Section 1962(c) provides:
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 A "pattern of racketeering activity" requires the commission of at least two acts of "racketeering activity," which is defined in § 1961(1). See 18 U.S.C. § 1961(5).
 
 
 [9]
 See note 1, supra
 
 
 [10]
 Appellants Hawkins and Holland also raised this issue. Because of our disposition of their appeals, we need not decide this issue as to those appellants
 
 
 [11]
 In a footnote, however, the Court recognized that there are constitutional limitations upon this power. See 100 S.Ct. at 1436 n.3
 
 
 [12]
 Similarly, the Court in Brown v. Ohio, 432 U.S. 161, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977) stated that "(w)here consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the Court does not exceed its legislative authorization by imposing multiple punishments for the same offense. (citations omitted)
 
 
 [13]
 Gerdes does not argue that the double jeopardy clause prohibits consecutive sentences for the predicate crimes and his conviction on the RICO conspiracy count. See United States v. Martino, 648 F.2d 367, 383 (5th Cir. 1981). See also Iannelli v. United States, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975)
 
 
 [14]
 Justice Rehnquist has observed that "the Blockburger test, although useful in identifying statutes that define greater and lesser included offenses in the traditional sense, is less satisfactory, and perhaps even misdirected, when applied to statutes (such as RICO) defining 'compound' and 'predicate' offenses." 100 S.Ct. at 1447 (Rehnquist, J., dissenting). But see Jeffers v. United States, 432 U.S. 137, 151, 97 S.Ct. 2207, 2216, 53 L.Ed.2d 168 (1977)
 
 
 [15]
 When asked by the government attorney to determine whether Swiere was present in the courtroom, Butler pointed to Swiere and stated, "I believe that's him. I am not sure." The court reporter asked Butler to repeat his identification, and Butler stated, "I said I believe that's him behind Martin Sneed, Jr." T.19:1744