Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio

★ ★ ★ ★ ★ ★



# MEMORANDUM OPINION

Nos. 04-09-00717-CV & 04-09-00718-CV

**IN THE MATTER OF N.K.M.**, a Juvenile

From the 289th Judicial District Court, Bexar County, Texas
Trial Court Nos. 2009-JUV-01790 & 2009-JUV-01693
Honorable Carmen Kelsey, Judge Presiding

Opinion by:      Phylis J. Speedlin, Justice

Sitting:         Karen Angelini, Justice
                 Phylis J. Speedlin, Justice
                 Rebecca Simmons, Justice

Delivered and Filed: September 1, 2010

AFFIRMED

In two cases tried together, N.K.M. was adjudicated as having engaged in delinquent conduct by committing aggravated assault with a deadly weapon, and aggravated robbery along with aggravated kidnapping. He was committed to the Texas Youth Commission (TYC) for a 20-year determinate sentence on each case, to be served concurrently. On appeal, N.K.M. argues the complainant's in-court identification was tainted by a suggestive pretrial identification procedure in one case, and that the evidence of identity was factually insufficient in the other case. We affirm the trial court's judgment in both cases.

**FACTUAL AND PROCEDURAL BACKGROUND**

These two cases arise out of two incidents that occurred on the same night in the same Converse, Texas neighborhood. On April 22, 2009, at approximately 11:00 p.m., Oscar Barella was sitting in his garage working on a hobby when he noticed a young man standing there pointing a gun at him. Barella confronted the young man, demanding, "what are going to do, are you going to shoot me for what, over what? . . . So you can get caught, go to jail and be somebody's bitch, take it up the a\*\*?" The young man's demeanor changed and he backed off. Barella stood up, realized he was quite a bit taller than the young man, and again demanded, "are you going to shoot me, go ahead, go ahead." The young man turned and fled. Barella chased him on foot, and saw him jump into the open passenger door of a Dodge Magnum which sped off. Barella wrote down the license plate number and called 911. When officers arrived, Barella described the young man as having "light skin," about 5 feet 6 inches tall, 150 pounds, and wearing a dark colored light jacket and dark ski mask. Barella told the officers that he had focused on the young man's eyes the entire time, and he was sure he could pick out the young man if he ever saw his eyes again. Barella stated the encounter lasted about two minutes.

At approximately 11:30 p.m., while the officers were still at Barella's house, a call came in that some other officers had spotted the Dodge Magnum about one-half mile away and were giving chase. The two suspects crashed the car, bailed out, and ran into a wooded area where they escaped. When the Dodge Magnum was processed, officers determined it had been stolen from Timothy Downey on April 15, 2009. Downey testified that he was carjacked at gunpoint in his driveway by one person, but there was at least one more person involved because a vehicle was blocking his driveway at the time.

Later that same night of April 22, 2009, at approximately 12:00 or 12:30 a.m., Ethel Carter was sitting inside her parked car reading a newspaper and waiting for her daughter to arrive with a key to the front door. Carter's house is at the other end of the same street where Barella lives. Two young men wearing gloves and masks approached Carter's Mercedes Benz which was parked in the driveway. Carter could see their eyes, nose, and mouth under the masks; she described one young man as "dark-complected" and the other as "light-complected." The dark-complected young man pointed a gun at Carter's head and asked whether she had a safe or any jewelry or guns inside the house. The light-complected young man held a gun on Carter while the dark-complected young man kicked the front door in; they took Carter inside where she was instructed to lie down on the floor. The light-complected young man pointed the gun at Carter's head while the dark-complected young man ransacked the house. Carter was told to face the floor and not look at them. They assured her they were not going to hurt her unless she called the police, at which point they would come back to kill her. At one point during the incident, the light-complected young man had his mask pulled up and Carter saw some of his face; she realized, "he's just a kid." The young men took the keys to Carter's Mercedes Benz and tied her up before they left in her car. When the police arrived, Carter described the young men to Bexar County Sheriff's Detective Kenneth Murray, stating the dark-complected one was wearing dark pants or jeans,[1] and the light-complected one was wearing blue shorts and blue and white tennis shoes.

Detective Murray had a "person of interest" in mind who he believed was connected with another series of robberies in the area. Murray went to Wagner High School the next morning and

---

[1] Detective Murray testified that Carter described the dark-complected young man as wearing "dark shorts, dark socks and tennis shoes."

asked for a picture of the young man of interest. Murray obtained the photo, and then asked the principal to call the young man up to the main office so he could compare his clothing with Carter's description. The young man arrived wearing dark shorts and black socks. He was accompanied by another young man wearing blue basketball shorts, blue and white tennis shoes, and a glove on his left hand. A camera took a photo as each young man entered the school office. A few days after the robbery, Detective Murray went to Ms. Carter's home and showed her a series of photo line-ups. Carter was unable to pick out anyone from the full-face photo displays. Carter did, however, pick out N.K.M. from a six-person "eyes-only" photo lineup–although she was "not quite sure." After she picked out N.K.M's photo from the lineup, Detective Murray showed Carter the photo of N.K.M. taken at Wagner High School the morning after the robbery when he was wearing blue basketball shorts, blue and white tennis shoes, and a glove on one hand. Carter confirmed that the blue tennis shoes and blue shorts matched what the light-complected young man was wearing the night of the robbery. When Detective Murray later showed the same "eyes-only" photo lineup to Barella, he picked out N.K.M. with no hesitation. Barella "had no doubt whatsoever" about the identification.

The State charged N.K.M. in two separate cases with engaging in delinquent conduct by committing aggravated assault with a deadly weapon against Oscar Barella and aggravated kidnapping/aggravated robbery against Ethel Carter. N.K.M. pled "not true" in both cases, and they were tried jointly before a jury. N.K.M. filed a motion to suppress the photo identification evidence, which was denied. After hearing the trial evidence, the jury found that N.K.M. engaged in delinquent conduct by committing aggravated assault with a deadly weapon against Oscar Barella, and by committing aggravated kidnapping and aggravated robbery with a deadly weapon against Ethel Carter. The State sought determinate sentences in each case. The court adjudicated N.K.M.

as having engaged in delinquent conduct as alleged in both cases, found a need for disposition, and committed N.K.M. to TYC for concurrent determinate sentences of 20 years in each case, with a possible transfer to the Texas Department of Criminal Justice. N.K.M. now appeals.

## ANALYSIS

In two issues, N.K.M challenges the trial court's judgment asserting that: (1) it erred in denying his motion to suppress Oscar Barella's in-court identification because it was tainted by a suggestive pre-trial identification procedure; and (2) the evidence of identity in the Ethel Carter case is factually insufficient.

### *Oscar Barella Case — Impermissibly Suggestive Pretrial Identification Procedure*

N.K.M. argues that the pretrial photo lineup that Detective Murray showed Barella was impermissibly suggestive because Murray told Barella the photo array contained a "person of interest;" therefore, N.K.M. asserts it tainted Barella's in-court identification which should have been suppressed. The State points out that Barella denied that Murray made such a statement, and asserts that, even if he did, it did not render the procedure impermissibly suggestive and did not create a substantial likelihood of misidentification.

***Standard of Review.*** We review a ruling on a motion to suppress in a juvenile case under the same standard used in a criminal case. TEX. FAM. CODE ANN. § 51.17(c) (Vernon Supp. 2009); *In the Matter of S.J.*, 977 S.W.2d 147, 151 (Tex. App.—San Antonio 1998, no pet.). We afford almost total deference to the trial court's determination of historical facts that the record supports, especially when the fact findings are based on an evaluation of the witnesses' credibility and demeanor, but review the court's application of the law to the facts *de novo*. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim.

App. 1997). Whether a pre-trial photo identification procedure was so impermissibly suggestive that it may have tainted an in-court identification is reviewed *de novo*. *Gamboa v. State*, 296 S.W.3d 574, 581 (Tex. Crim. App. 2009); *Loserth v. State*, 963 S.W.2d 770, 771-72 (Tex. Crim. App. 1998). When the trial court does not make express findings of fact and conclusions of law, we assume the court made implicit findings of fact in support of its ruling as long as such findings are supported by the record. *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005). We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996).

*Analysis.* An in-court identification is inadmissible when it has been tainted by an impermissibly suggestive pre-trial photo identification procedure. *Gamboa*, 296 S.W.3d at 581; *Loserth*, 963 S.W.2d at 772. The appellant bears the burden to show by clear and convincing evidence that the in-court identification is unreliable. *Madden v. State*, 799 S.W.2d 683, 695 (Tex. Crim. App. 1990). The test is whether, considering the totality of the circumstances, "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Gamboa*, 296 S.W.3d at 582 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)); *Loserth*, 963 S.W.2d at 772. In assessing reliability under the totality of the circumstances, the court considers the following factors *de novo*: (1) the witness's opportunity to view the appellant at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the appellant; (4) the witness's level of certainty at the time of the confrontation; and (5) the length of time between the offense and the confrontation. *Gamboa*, 296 S.W.3d at 582 (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)); *Loserth*, 963 S.W.2d at 772.

As the State points out, there was conflicting testimony at the suppression hearing as to whether Detective Murray informed Barella there was a "person of interest" in the six-person photo lineup. Murray testified at the hearing that before he showed Barella the photo lineup, he stated, "[t]hat I had a series of six photographs I wanted him to look at. That I wasn't sure if anybody in the six photographs were [sic] the actor involved, but at least one of them was a person of interest." Murray stated he did not suggest who Barella should pick out. Barella testified that before he showed him the photo array, Murray told him, "Well, I'll show you a lineup. All it is is [sic] just a focus on their eyes. You take a look at it and pick out the person you think it may be." Barella stated that Murray did not indicate who he thought it was, but also did not tell him the person may not be in the line-up. Murray just asked him, "is he in this lineup?" On cross-examination at the hearing, Barella was asked whether he recalled the detective telling him a "person of interest" was in the photo spread, and Barella answered "No."

At a suppression hearing, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). We must view the evidence in the record, and all reasonable inferences, in the light most favorable to the trial court's ruling, and must sustain the ruling if it is reasonably supported by the record and is correct on any applicable theory of law. *Villarreal*, 935 S.W.2d at 138. Applying that standard of review, we must assume the trial court made implicit fact findings in support of its denial of the motion to suppress, and that it chose to believe Barella's testimony that Murray did not mention a "person of interest" being in the photo lineup.

Even assuming that Murray did tell Barella that a "person of interest" was in the photo lineup, and that Murray's statement was "impermissibly suggestive," we conclude that N.K.M. failed

to carry his burden to prove the identification procedure gave rise to a "very substantial likelihood of irreparable misidentification." *Madden*, 799 S.W.2d at 695 (appellant has burden to show by clear and convincing evidence that in-court identification is unreliable due to impermissibly suggestive pre-trial procedure). Assessing reliability under the *Biggers*' factors, the record shows that Barella viewed his assailant for approximately two minutes, and paid close attention to the young man's eyes during the entire encounter. Barella testified that he could not see the young man's whole face because of the ski mask, but he "focused on his eyes" throughout the whole two-minute scenario. Barella explained that it was just his reaction–"I looked him in the eyes, and that's all I could see." While Barella's opportunity to observe the young man was somewhat limited by the ski mask, his degree of attention to a particular facial feature, the eyes, was very high; moreover, that high degree of attention was sustained for a two-minute period. When the officers arrived, Barella told them he could identify the young man if he saw his eyes again. Murray showed Barella the "eyes only" six-person photo lineup only a few days after the incident. Barella studied each of the six photos for a few seconds, and "focused right on" Number 6, which was N.K.M. Barella testified he was certain that Number 6 was the young man in his garage. As to the accuracy of Barella's description of his assailant, there was very limited evidence presented at the suppression hearing from which the accuracy of his description could be determined. Weighing the *Biggers*' factors against the "corrupting effect" of the presumably suggestive pre-trial identification, we conclude that Barella's high degree of attention to his assailant's eyes for the entire encounter, his absolute certainty of his identification of N.K.M. from the photo array, and the short time period between the incident and the pre-trial identification all weigh heavily in favor of his in-court identification being reliable.

*Loserth*, 963 S.W.2d at 773-74. Accordingly, the trial court did not err in denying N.K.M.'s motion to suppress the identification evidence.

***Ethel Carter Case — Factual Sufficiency of Evidence of Identity***

In the second case, N.K.M. asserts the evidence is factually insufficient to support the jury's finding that he is one of the persons who committed the aggravated kidnapping and aggravated robbery against Ethel Carter. N.K.M. contends that Carter's identification of him as the perpetrator was "'so weak' as to render the evidence factually insufficient." The State concedes that Carter's identification was less than positive but contends there is other corroborating evidence that, when combined with Carter's identification, is sufficient to support the jury's verdict.

***Standard of Review.*** In reviewing the sufficiency of the evidence in a juvenile adjudication proceeding, we apply the sufficiency standards of review used in criminal cases. *In re T.K.E.*, 5 S.W.3d 782, 784-85 (Tex. App.—San Antonio 1999, no pet.). When conducting a factual sufficiency review, we consider all the evidence in a neutral light, and will set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); *In re K.T.*, 107 S.W.3d 65, 71 (Tex. App.—San Antonio 2003, no pet.). An appellate court may reverse for factual insufficiency in only two instances: if the evidence in support of the verdict, although legally sufficient, is so weak that the verdict is clearly wrong and manifestly unjust; or if, considering conflicting evidence, the verdict is outweighed by the great weight and preponderance of the evidence. *Lancon*, 253 S.W.3d at 705. Finally, our review must be appropriately deferential so as to avoid merely substituting our judgment for that of the jury. *Id.*; *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996).

*Analysis.* N.K.M. asserts the in-court identification testimony by Carter was "so weak" that it is factually insufficient to support the jury's finding that he was a perpetrator of the aggravated kidnapping and aggravated robbery against Carter. It is well established that the State must prove beyond a reasonable doubt that the accused is the person who committed the alleged offense. *Johnson v. State*, 673 S.W.2d 190, 196 (Tex. Crim. App. 1984); *Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd). The identity of the accused as the perpetrator may be proved by direct or circumstantial evidence, or by inferences drawn from such evidence. *Roberson*, 16 S.W.3d at 167. We apply the same sufficiency standards to both direct and circumstantial evidence. *Id.*; *McGee v. State*, 774 S.W.2d 229, 238 (Tex Crim. App. 1989). A witness's less than positive identification of the defendant goes to the weight of the evidence. *Valenciano v. State*, 511 S.W.2d 297, 299 (Tex. Crim. App. 1974).

N.K.M. asserts that Carter's identification of him was too uncertain to constitute factually sufficient evidence. During trial, when Carter was asked if she saw either the dark-complected or the light-complected young man in the courtroom, she replied, "It's him." When asked to say it louder, Carter stated, "I think that's him over there," and described the clothing N.K.M. was wearing in court. When the prosecutor asked Carter if she was sure that was one of the boys inside her house, she replied, "I'm not positively sure, but I think so." She testified he was the light-complected one whose mask had been pulled up. Carter also testified about her pre-trial identification of N.K.M. from an "eyes-only" photo lineup. Carter stated she picked out N.K.M.'s photo, but wrote a note on the back stating, "I think this is the person, but I'm not quite sure." Detective Murray testified that when Carter picked out N.K.M.'s photo, she initially said, "this is him, this is the one," but then she wrote on the back of the photo that she was "not quite sure." Murray explained that he then showed

Carter the photo from Wagner High School "just to put her mind at ease." When Carter saw the school photo, she stated, "those are the shorts, those are the shoes," and became nervous and started shaking and tearing up. Detective Murray testified that, in his opinion, Carter wrote the note stating she was "not sure" about the identification because she had been threatened during the robbery and was afraid of retaliation.

An uncertain in-court identification is not, by itself, sufficient to support a guilty verdict. *Anderson v. State*, 813 S.W.2d 177, 179 (Tex. App.—Dallas 1991, no pet.) As the State points out, however, the presence of corroborating facts or circumstances connecting the accused to the crime, when coupled with a less-than-certain eyewitness identification, may be sufficient to support the jury's finding of identity. *Id.*; *Redwine v. State*, 305 S.W.3d 360, 367 (Tex. App.—Houston [14th Dist. ] 2010, pet. filed); *Swartz v. State*, 61 S.W.3d 781, 788-89 (Tex. App.—Corpus Christi 2001, pet. ref'd); *United States v. Hawkins*, 658 F.2d 279, 289 (5th Cir. 1981) (when there is other evidence of identity, the tentative nature of the in-court identification is not fatal).

Here, there was other evidence connecting N.K.M. to the robbery at Carter's home. Barella positively identified N.K.M. with complete certainty as the masked assailant who threatened him at around the same time on the same evening as the robbery at Carter's house. Barella's house is on the opposite end of the same street as Carter's house. This evidence shows that N.K.M. was in the area of Carter's house at the time of the robbery—wearing a ski mask. In addition, the photo of N.K.M. taken the next morning at school matched Carter's description of the blue clothes and shoes the light-complected assailant wore, and Carter confirmed the matching clothes when she saw the school photo. Moreover, Carter's emotional reaction to the school photo showing N.K.M.'s full body corroborates her uncertain identification.

Finally, N.K.M.'s own statements connected him to the events of April 22, 2009. When Detective Murray interviewed N.K.M. in the presence of his father, N.K.M. admitted being a "hard-core" member of the Crips gang. Murray testified that in his experience the Crips' colors are light blue. When asked about the photo of him taken at Wagner High School on April 23, 2009, N.K.M. stated that he remembered that because he got called in to the principal's office for wearing the blue colors at school. N.K.M. explained that he told the principal that he had put those clothes on the night before. When his father objected that he was only a "wannabe" gang member, N.K.M. corrected him in the presence of Detective Murray, stating that he is "hard core, everyone at the school knows it, that he doesn't have to wear blue every day because everybody knows it, [and] that he only wears the blue when he intends to go out and hurt somebody."

Combining the pre-trial and in-court identifications by Carter with the corroborating facts and circumstances in the record, we conclude that the evidence of N.K.M.'s identity as the perpetrator of the aggravated kidnapping/robbery against Carter is factually sufficient to support the jury's verdict. The identity evidence is not "so weak" as to render the verdict "clearly wrong and manifestly unjust." *Lancon*, 253 S.W.3d at 705.

Based on the foregoing reasons, we affirm the trial court's judgment in both cases.


Phylis J. Speedlin, Justice