**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**William HOOVER, Defendant–Appellant.**

No. 04CA1794.

Colorado Court of Appeals, Div. IV.

Nov. 16, 2006.

Certiorari Denied Aug. 27, 2007.

John W. Suthers, Attorney General, Mathew D. Grove, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Hoffman Reilly Pozner & Williamson, L.L.P., Marcus Lock, Sean Connelly, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge LOEB.

Defendant, William Hoover, appeals the judgment of conviction entered on jury verdicts finding him guilty of securities fraud, theft, and violating the Colorado Organized Crime Control Act (COCCA). He also appeals the sentences imposed. We affirm.

Defendant, a businessman and investment advisor, was indicted on twenty-two counts of securities fraud, class three felonies, pursuant to §§ 11–51–501(1) and –603(1), C.R.S. 2006, and twenty-five counts of theft, class three felonies, pursuant to § 18–4–401(1)(a), (1)(b) and (2)(d), C.R.S.2006, all allegedly committed against twenty-five victims. The counts in the indictment were separated according to the victims' names, and for most of the victims, alleged counts of both securities fraud and theft. Defendant was also indicted on one count of violating COCCA, a class two felony, pursuant to § 18–17–104(3), C.R.S.2006.

All forty-eight counts in the indictment related to several investment vehicles and partnerships that defendant managed over a number of years. The majority of the charges against defendant were connected to one or both of his primary investment schemes, the Agency Account of The Will Hoover Company, Inc. (WHCO), and Bird Ventures LLC.

Between 1999 and 2003, defendant collected investments in the Agency Account by promising investors that their money would be held in a federally insured account in the Fleet Bank of Boston, accruing high annual fixed returns beyond what the investors could obtain on their own. However, defendant never deposited the money with Fleet Bank, and, indeed, no such account existed. Although defendant sent the victims account statements from WHCO purportedly reflecting their invested principal and accrued interest, the evidence at trial showed that

funds invested by the victims in the Agency Account were converted to defendant's personal use or used by him to pay his debts owed to earlier investors.

Between 2000 and 2003, defendant also solicited investments in Bird Ventures LLC, a company he founded with five other individuals for the purpose of acquiring a thirty-five percent ownership interest in another company which provided consulting services to major oil companies. Defendant, who was the manager of Bird Ventures, sold convertible debentures in that entity to outside investors without the required authorization from sixty-seven percent of the members of the LLC. He then used the money he raised to pay his personal business expenses and to reimburse other investors, and he also converted a portion of the invested funds to his personal use.

The securities fraud charges arose primarily from defendant's misrepresentations and omissions to make disclosures to investors in the Agency Account and Bird Ventures. The evidence at trial showed that defendant failed to inform investors that his business interests were in financial trouble; that he planned to use invested money to pay off other investors and personal debts; that the Internal Revenue Service had tax liens against him; and that he had been sued by a business associate and investor, who obtained a judgment against him. The evidence also showed that defendant misrepresented to Agency Account investors that he was depositing their money in a Fleet Bank of Boston account, when no such account existed. With respect to the Bird Ventures convertible debentures, the evidence showed, inter alia, that defendant failed to inform outside investors that he lacked the requisite authority to encumber that company with debt.

In sum, the evidence at trial showed that, over a period of several years, defendant defrauded dozens of investors and converted over fifteen million dollars from them.

Defendant and WHCO eventually filed for Chapter 11 bankruptcy reorganization, and then converted the bankruptcy to a Chapter 7 liquidation.

After a two-week trial, a jury convicted defendant of twenty-two counts of securities fraud, twenty-one counts of theft, and one count of organized crime under COCCA. Accordingly, with respect to each of defendant's twenty-five victims, as set forth in the indictment, there was at least one conviction for either securities fraud or theft, and for many of the victims, there was a conviction for both crimes.

The trial court sentenced defendant to four years in prison for each of the securities fraud and theft convictions. For each victim, where defendant had been convicted of both theft and securities fraud, the trial court sentenced defendant to four years for the theft charge, to be served consecutively with all other sentences, and four years for the securities fraud charge, to be served concurrently with the corresponding theft charge. For three victims, defendant was charged and convicted only of theft, and the court sentenced defendant to four years for each such charge, to be served consecutively. For four victims, where defendant was convicted only of a securities fraud charge, the court sentenced defendant to four years for each such charge, to be served consecutively. Ultimately, the trial court aggregated all twenty-one of the theft convictions and four of the securities fraud convictions consecutively, for a total sentence of one hundred years. The court imposed all the remaining sentences concurrently, including a twenty-four year sentence for the COCCA conviction. This appeal followed.

I. Securities Fraud—Evidentiary Issues

Defendant contends that his convictions for securities fraud must be reversed because the trial court erred in excluding certain evidence on hearsay grounds. Specifically, defendant contends that the trial court impermissibly infringed upon his constitutional right to present a defense, by prohibiting him from testifying about his attorney's advice on four separate matters. We disagree.

We review a trial court's evidentiary rulings for abuse of discretion. A trial court abuses its discretion only when its ruling is manifestly arbitrary, unreasonable, or unfair. *People v. Stewart*, 55 P.3d 107, 122 (Colo.

2002); *People v. Veren,* 140 P.3d 131, 136 (Colo.App.2005). Absent an abuse of discretion, we will not disturb a trial court's evidentiary rulings on appeal. *People v. Ibarra,* 849 P.2d 33, 38 (Colo.1993); *People v. Veren, supra.*

Hearsay is a statement other than the one made by declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. CRE 801(c); *People v. Scearce,* 87 P.3d 228, 233 (Colo.App.2003). Where a statement is offered, not to prove the truth of the matter asserted, but for some other reason, such as to show defendant's state of mind, it is admissible as non-hearsay. *People v. Mossmann,* 17 P.3d 165, 168 (Colo.App.2000). However, the out of court statement must still be relevant to be admissible. *People v. Scearce, supra.*

Few rights are more fundamental than the right of the accused to put before the jury evidence that might influence the determination of guilt. *People v. Scearce, supra.* Because improper exclusion of non-hearsay evidence affects a defendant's fundamental right to present exculpatory evidence, any error in doing so is of constitutional dimension, and reversal is required unless we are persuaded beyond a reasonable doubt that it did not contribute to defendant's conviction. *People v. Scearce, supra,* 87 P.3d at 234. "In making this assessment, we ask 'not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.' " *People v. Scearce, supra* (quoting *People v. Welsh,* 58 P.3d 1065, 1072 (Colo.App.2002)). If a reasonable possibility exists that the error contributed to the verdict, then the error is not harmless. *People v. Scearce, supra.*

### A. Advice Regarding Whether Bird Ventures Debentures Were a Security

Defendant first contends that the trial court erred by not permitting him to testify as to his lawyer's advice regarding whether the Bird Ventures convertible debentures were securities. We disagree.

The required mental state for securities fraud is "willfully." *People v. Blair,* 195 Colo. 462, 579 P.2d 1133 (1978); *see* § 11–51–603(1) (any person who willfully violates the provisions of § 11–51–501, C.R.S.2006, the securities fraud statute, commits a class 3 felony). This requires that an actor be "aware that his conduct is of such nature or that such circumstance exists." Section 18–1–501(6), C.R.S.2006; *see People v. Pahl,* —— P.3d ——, 2006 WL 3040920 (Colo.App. No. 01CA2020, Aug. 24, 2006).

However, "federal and state authority is uniform in concluding that proof of knowledge that an investment is a security is not required to convict a defendant for 'willful' securities fraud." *People v. Rivera,* 56 P.3d 1155, 1163 (Colo.App.2002). In *Rivera,* a division of this court concluded "that the General Assembly did not intend to apply the culpable mental state of willfulness to the security element." *People v. Rivera, supra; see United States v. Brown,* 578 F.2d 1280, 1284 (9th Cir.1978)("government is required to prove specific intent only as it relates to the action constituting the fraudulent, misleading or deceitful conduct, but not as to the knowledge that the instrument used is a security").

Here, the record reflects the following interaction at trial:

Defense Counsel: Tell me about Bird. Did you think Bird was a secured—

Defendant: Absolutely not. Harvey, in my records somewhere, I have a lot [of] documentation from very qualified people—that Bird is—

Prosecutor: Objection. This is hearsay.

The Court: Sustained.

Defense Counsel: It goes to his state of mind, Judge. . . .

The Court: Sustained.

We assume from this exchange that defendant was attempting to testify that his attorney advised him that the convertible debentures were not securities. As such, although the evidence may have been admissible as nonhearsay showing defendant's state of mind, defendant's belief that the Bird Ventures debentures were not a security was

irrelevant to the securities fraud prosecution. *See Torrez v. Edwards,* 107 P.3d 1110, 1113 (Colo.App.2004) (we may affirm trial court on any grounds); *People v. Scearce, supra,* 87 P.3d at 233 (to be admissible, nonhearsay must still be relevant). Accordingly, we conclude the trial court did not err by excluding this evidence.

### B. Advice on Disclosure of Investor Lawsuit

Defendant next contends that he was improperly precluded from testifying as to his attorney's advice regarding whether he was required to disclose that one of his investors and business associates had filed a lawsuit and recovered a judgment against him. We disagree.

T.F., a longtime friend and client of defendant, invested a total of $889,500 in the Agency Account and Bird Ventures. When T.F. requested the $400,000 he had invested in the Agency Account, defendant failed to repay it, but instead offered T.F. three demand corporate promissory notes totaling $889,500. T.F. accepted the notes, demanded payment on them, and then sued defendant, obtaining a judgment against him for $1,100,000. T.F. then filed a lien on defendant's house.

During defendant's testimony at trial, the record reflects the following exchange:

Defense Counsel: And did you disclose to anybody—let's go back to the [T.F.] lawsuit in terms of subsequent investors. We know ... [T.F.'s] lawsuit commenced in about 2001, October. Notes were signed October 2. Did you disclose that to subsequent investors?

Defendant: Did I proactively go out and say, before you do business with me, I have a lawsuit from [T.F.]? No.

Defense Counsel: Now was Mr. [M.], who is your lawyer in-house, aware of the [T.F.] lawsuit?

Defendant: Yeah. He negotiated the settlement.

Defense Counsel: In terms—I don't need to know what the discussions were, in terms of those discussions, did you feel after those discussions you had an obligation to do anything?

Prosecutor: Objection. That calls for hearsay.

Defense Counsel: I'm not asking for what the discussions were, just what he felt afterward.

The Court: Overruled.

Defendant: Can I give a two-part answer?

Defense Counsel: Sure.

Defendant: Now yes, then no.

By overruling the prosecutor's objection, the trial court allowed defendant to testify to defense counsel's original question. Defense counsel specifically stated that he was not attempting to elicit the content of defendant's discussions with his attorney. Because the trial court overruled the prosecution's objection and defendant answered the question that was asked, we perceive no error.

### C. Advice Concerning Bankruptcy Filing

Defendant contends that his securities fraud convictions should be reversed because the trial court erred in excluding evidence of his attorneys' advice regarding his decision to file for bankruptcy. We disagree.

The record reflects the following exchange:

Defense Counsel: What was your understanding between Chapter 11 and Chapter 11? [sic]

Defendant: Chapter 11, and this is why I called up all of my clients, and all my agency clients, all my Bird people, and all my just normal clients, I was told to put the [T.F.] lien—this is the part that is so—

Prosecutor: Objection. Calls for hearsay.

The Court: Sustained.

Defense Counsel: Don't tell me what you were told. Tell me about your thought process about the [T.F.]—

Defendant: Okay. What they called stay. To freeze his lien and not make it effective against other creditors of mine, these victims, these people that didn't deserve that, I had to file bankruptcy.... There were three judgments filed in various forms, but still constant discussion, friendly negotiation with all of them. I was told that if I didn't do that—

Prosecutor: Objection. Calls for hearsay.

The Court: Sustained.

Defense Counsel: What was your concern?

Defendant: That everyone else would get hurt.

Defendant contends that the legal advice he was prohibited from discussing would have shed light on, and was relevant to, his intent to repay his creditors in Chapter 11 rather than seeking to avoid and discharge his debts. As such, he contends such testimony was admissible as nonhearsay evidence.

Even assuming that this evidence could have been admitted as nonhearsay, defendant simply has not articulated any rational explanation as to why testimony concerning his reasons for declaring bankruptcy, which occurred well after the alleged fraudulent misrepresentations and omissions in this case, is relevant to the securities fraud charges. *See People v. Scearce, supra,* 87 P.3d at 233. Therefore, we conclude that, with respect to the securities fraud charges, the trial court did not err in excluding the challenged testimony, and, thus, did not infringe on defendant's right to present a defense.

### D.   Advice Concerning Authority to Issue Debentures

Defendant contends that the trial court erred in excluding testimony about his attorney's advice concerning defendant's authority to sell Bird Ventures convertible debentures to outside investors. We are not persuaded.

■ Advice of counsel is relevant to the fraudulent practices aspect of a securities charge if a defendant can show that he or she relied in good faith on advice that his or her actions were legal, to show lack of scienter. *People v. Terranova,* 38 Colo.App. 476, 481, 563 P.2d 363, 367–68 (1976).

Here, the record shows the following exchange at trial:

Defense Counsel: What about your authority to do this? The operating agreement says that takes 67 percent approval of founders to get debt. Debt is obviously the debenture Bird would own?

Defendant: I was—

Defense Counsel: Tell me about that.

Defendant: I'm not as stupid as I sound all the time. I had great counsel, including counsel outside of other people I've already mentioned, specifically on that issue. And I was advised—now, granted, I'm the entrepreneur businessman, I wanted to hear the answer. I wanted to hear the answer. I wanted to hear that and I admit that. But I heard—

Prosecutor: Objection. Calls for hearsay.

The Court: Objection.

Defendant: [J.M.] (defendant's in-house counsel)—

Prosecutor: Objection.

The Court: Sustained.

Defense Counsel: Let me ask it this way. Who drafted those debenture agreements?

Defendant: [J.]

Defense Counsel: [J.] who?

Defendant: [J.M.]

Defense Counsel: We're talking about the outside debenture agreements?

Defendant: Same as the inside debenture agreements.

Defendant contends that the trial court denied his constitutional right to present a defense by excluding this testimony, which he now claims was offered to show his state of mind, when the court sustained the prosecution's objection and precluded him from testifying to his attorney's advice concerning his authority to sell the convertible debentures to outside investors. *See People v. Mossmann, supra; People v. Terranova, supra.*

■ The People contend that, even assuming it was error to exclude such testimony because it would have been relevant to defendant's state of mind, any such error was not properly preserved for review on appeal. We agree with the People.

CRE 103 provides:

(a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ...

(2) Offer of Proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

See *People v. Harris,* 762 P.2d 651, 660–61 (Colo.1988).

Here, it is uncontested that defendant did not make an offer of proof. Moreover, we conclude that it is not apparent from the context what the substance of the proposed testimony would have been. The record shows that, when the prosecution's objection was sustained, defense counsel made no objection to the ruling, did not expressly articulate that the testimony was being offered to show defendant's state of mind, made no argument to the court, and simply rephrased the question. From the context within which the questions were asked, it is not apparent that evidence concerning the lawyer's advice was being offered to show defendant's state of mind rather than to establish that defendant, in fact, had authority to sell the debentures. Under such circumstances, we do not discern that defendant complied with the requirements of CRE 103(a)(2), to preserve this specific evidentiary ruling for appeal.

We are not persuaded by defendant's reliance on *People v. Lowe,* 39 Colo.App. 312, 565 P.2d 1352 (1977). In that case, although no formal offer of proof was made, defendant repeatedly objected to the trial court's ruling, and "in view of the extended discussion of the matter by the respective counsel and the court, it [was] evident that the court was fully apprised of the nature of the proffered testimony." See *People v. Lowe, supra,* 39 Colo.App. at 315, 565 P.2d at 1354; *see also United States v. Eisenstein,* 731 F.2d 1540, 1545 (11th Cir.1984)(court found error where defense attorney attempted repeatedly despite hearsay objections to elicit from defendant's financial attorney the advice on which defendant had supposedly relied, and, when all objections were sustained, requested the court to "hear me on this," and was refused); *United States v. Alden,* 476 F.2d 378 (7th Cir.1973)(court erred by sustaining objections to at least eight repeated questions in different forms as to whether a psychiatrist

had been able to make a diagnosis or clinical observation of defendant).

Because defendant did not make an offer of proof, and because it was not apparent from the context what the substance of the testimony would have been, we thus conclude that defendant may not predicate error on the trial court's evidentiary ruling.

## II. Agency Account as a "Security"

Defendant contends that his securities fraud convictions should be reversed on the grounds that there was insufficient evidence to establish that the Agency Account was a security. Defendant relies specifically on the testimony of certain investors that they invested funds with defendant to place in an interest-bearing account at a federally insured bank. We disagree.

■ Whether a particular transaction involves a security depends not on the name or the form of the instrument, but on the substantive economic realities underlying the transaction. *Joseph v. Viatica Mgmt., LLC,* 55 P.3d 264, 266 (Colo.App.2002); *see Feigin v. Digital Interactive Assocs., Inc.,* 987 P.2d 876, 881 (Colo.App.1999) (general partnership or joint venture could be an investment contract where the controlling power was in investment manager's hands).

■ Under Colorado law, a security includes an investment contract. See § 11–51–201(17), C.R.S.2006; *Joseph v. Viatica Mgmt., supra.* The test for determining whether a particular scheme is an investment contract is "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." See *Sec. & Exch. Comm'n v. W.J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946); *People v. Pahl, supra,* —— P.3d at ——; *Joseph v. Viatica Mgmt., supra.* These third-party efforts must be significant, that is, essential managerial efforts that affect the success or failure of the enterprise. *Joseph v. Viatica Mgmt., supra.* An investment contract "need not involve more than one investor nor be limited to those circumstances wherein there are multiple investors who are joint participants

in the same enterprise." Section 11–51–201(17).

■ It is the jury's responsibility to apply the facts to the definition of "security" supplied by the court to decide whether a particular transaction is a security. *See People v. Pahl, supra,* —— P.3d at ——; *United States v. Johnson,* 718 F.2d 1317, 1323–24 (5th Cir.1983).

■ We review a jury's finding that a particular transaction is a security for sufficient evidence. *People v. Blair, supra,* 195 Colo. at 472, 579 P.2d at 1141. When the sufficiency of the evidence is challenged on appeal, the reviewing court must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of guilt beyond a reasonable doubt. *People v. Sprouse,* 983 P.2d 771, 777 (Colo.1999); *Kogan v. People,* 756 P.2d 945, 950 (Colo.1988); *People v. McIntier,* 134 P.3d 467, 471 (Colo. App.2005).

Here, the jury was instructed that the prosecution had the burden to prove beyond a reasonable doubt that a security was being offered or sold, and was also instructed that the term "security" included an "investment contract."

Further, the term "Investment Contract" was properly defined in the instructions as:

(1) an investment of money; (2) in a common enterprise: (3) with the expectation of profit from the efforts of others. The third-party efforts must be significant, that is, essential managerial efforts that affect the success or failure of the enterprise.

Defendant thus had the benefit of the trial court's legal instructions on the definition of a security, and he did not object to these instructions at trial nor does he do so on appeal. Defendant has never asserted that the jury instructions were in any way inconsistent with the law, nor did he request a preliminary judicial determination of whether the Agency Account was a security in his motion for judgment of acquittal. Cf. *People v. Pahl, supra,* —— P.3d at —— (defendant's right to a legal determination of whether the instrument was a security was satisfied by the trial court's finding that there was sufficient evidence in this regard to send the case to a jury).

■ Based on our review of the record, we conclude that there was sufficient evidence to support the jury's finding that the Agency Account was a security. The record shows that defendant offered investors an opportunity to invest their money through the WHCO "Agency Account," in a Fleet Bank of Boston account paying a high annual rate. Some of the investors believed that their money would be pooled with other investors' money, and others believed that they would have their own account. But all of the victims who invested in the Agency Account believed, based on defendant's representations to them, that defendant, through his personal efforts and reputation, was able to obtain a more favorable interest rate for their invested funds than they would be able to obtain on their own. The record also shows that they invested money in the Agency Account as a common enterprise with defendant. Rather than depositing their money directly in Fleet Bank, they turned it over to defendant to invest in the Agency Account. Further, investor statements of their balance and earnings came directly from the WHCO, not from Fleet Bank. The evidence at trial showed that defendant controlled the victims' money, that their profits were to come solely through his efforts, and that the success or failure of the Agency Account investment depended significantly upon those efforts.

Further, the expert witness for the prosecution testified, "It would be my conclusion that the transaction involving Mr. Hoover and the agency account would constitute an investment contract and therefore, [a] security under Colorado law."

We reject defendant's reliance on *Marine Bank v. Weaver,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982). *Marine Bank* held that in a securities fraud case against a federally regulated bank, a certificate of deposit was not the functional equivalent of a security, in large part because certificates of deposit are subject to comprehensive regulations governing the banking industry. *Ma-*

*rine Bank v. Weaver, supra,* 455 U.S. at 558, 102 S.Ct. at 1224. Here, however, the Agency Account was not a certificate of deposit or ordinary bank account but an investment scheme totally managed by defendant, whereby money was pooled and then supposedly invested at Fleet Bank. As indicated, the evidence showed that, contrary to his representations to the victims, defendant never even opened an account at Fleet Bank. Indeed, as discussed above, statements of principal and interest came from the WHCO, and investors had no access to their supposed accounts at Fleet Bank. Here, unlike in *Marine Bank,* the evidence showed that the victims were not depositing their money directly in an interest-bearing bank account, but were entrusting their money to defendant to invest in his enterprise, with the expectation that defendant would, through his efforts, obtain for them a higher than normal interest rate.

Accordingly, we conclude that there was sufficient evidence to support the jury's finding that the Agency Account was a security.

### III.  Prosecutorial Misconduct

■ Defendant contends that his securities fraud convictions should be reversed because the prosecution committed misconduct during closing argument. We are not persuaded.

■ The scope of final argument rests in the sound discretion of the trial court, and its rulings will not be disturbed on appeal in the absence of a gross abuse of discretion resulting in prejudice and a denial of justice. *People v. Wallace,* 97 P.3d 262, 269 (Colo.App. 2004).

■ When, as is the case here, a claim of improper prosecutorial argument was not preserved by a contemporaneous objection at trial, the applicable standard of review is plain error. *People v. Constant,* 645 P.2d 843, 847 (Colo.1982). In the context of closing argument, plain error does not exist unless a prosecutor's misconduct is flagrant or glaringly or tremendously improper. *People v. Constant, supra.* The misconduct must undermine the fairness of the trial itself so as to cast serious doubt on the reliability of the

judgment of conviction. *People v. Wallace, supra,* 97 P.3d at 268–69.

The indictments on the securities fraud counts alleged that defendant:

in connection with the offer, sale, or purchase of a security, to-wit: investment contract, did feloniously, unlawfully, and willfully, directly or indirectly, (a) employ any device, scheme, or artifice to defraud, (b) make an untrue statement of material fact, or to omit to state a material fact necessary in order to make statements made, not misleading, and (c) engage in an act, practice, or a course of business which operated and would operate as a fraud or deceit upon [victim] . . .

The prosecution argued in its closing that defendant's own testimony showed that the Agency Account was a security, because defendant had taken the position that "I offered them the opportunity to invest in me, agency account, the Will Hoover Bank, expectation of profit, 9 percent." Later, the prosecution argued that the defense expert's premise that the Agency Account was "purchasing a Certificate of Deposit" was wrong because defendant had taken the position that "the agency account was always an investment in me."

We reject defendant's contention that the prosecution's argument asked the jury to decide the issue whether the Agency Account was a security on legally inconsistent grounds, and that the prosecution should have confined its argument to whether a deposit in Fleet Bank was a security. The record shows that the prosecution's theory throughout the trial was that the Agency Account itself was a security, and this theory was consistent both with the indictment and with those portions of defendant's testimony used by the prosecution in closing argument.

Further, the record shows that defendant denied throughout his testimony that he had promised the victims that their money would be deposited into a Fleet Bank account, but insisted instead that the account was merely a barometer for the interest rate the investors would earn.

We thus conclude that the prosecution's comments were not an unfair characteriza-

tion of defendant's testimony and that the legal inferences drawn by the prosecution were proper. *See People v. Wallace, supra,* 97 P.3d at 269 ("[c]ounsel may comment on the evidence admitted at trial and the reasonable inferences that can be drawn therefrom"). Accordingly, we perceive no error, let alone plain error, in the prosecution's closing argument.

### IV. Theft Convictions

Defendant also contends that the trial court committed reversible error with respect to his theft convictions. We disagree.

### A. Evidentiary Error

■ Defendant contends that the trial court committed reversible error by erroneously sustaining the prosecution's hearsay objections to testimony about his attorney's advice concerning his bankruptcy filing, as discussed above in section I.C. Specifically, defendant contends exclusion of this testimony precluded him from showing that his filing was a Chapter 11 reorganization rather than a Chapter 7 liquidation; that his purpose in filing bankruptcy was to repay his victims; that, in fact, he repaid some of his investors after he converted the bankruptcy to a Chapter 7; and that this evidence would have demonstrated his lack of specific intent to commit theft by permanently depriving the victims of their money. We perceive no reversible error.

Theft is a specific intent crime, and the prosecution must prove the defendant had the intent to "deprive the other person permanently of the use or benefit of the thing of value." *See* § 18–4–401(1)(a); *see also* § 18–1–501(5), C.R.S.2006 (definition of "intentionally" or "with intent.")

Assuming, without deciding, that the testimony here was not hearsay and was relevant to defendant's state of mind as it related to the theft charges, we nevertheless conclude that any error in sustaining the prosecution's objections was harmless.

The record shows that defendant was able to provide substantial testimony concerning his state of mind and specifically his intentions with respect to filing for bankruptcy.

He explained his thoughts regarding freezing the senior T.F. lien by filing a Chapter 11 reorganization bankruptcy, and he articulated his overall goal to repay his victims. He also testified on direct examination that he eventually converted his bankruptcy to a Chapter 7 liquidation and that he repaid some of his victims thereafter.

Although the prosecution argued in its closing that the bankruptcy filing demonstrated defendant's intention permanently to deprive his victims of their money, the record shows that defense counsel also argued at some length in his closing that, despite the bankruptcy, defendant had repaid some of his victims and that this evidence showed that defendant did not intend to commit theft. There was also overwhelming evidence that defendant converted the invested funds to his own use or to repay other investors.

Because the record shows that defendant testified concerning his thought process in filing for bankruptcy and that he also argued his theory of defense to the jury, and because the record contains overwhelming evidence of defendant's intent permanently to deprive the victims of their money, we conclude the trial court's evidentiary ruling, even if error, was harmless because it could not have contributed to the jury's verdict on the theft counts. *See People v. Scearce, supra,* 87 P.3d at 234.

### B. Jury Question

■ Defendant contends that the trial court incorrectly answered a jury question and that his theft convictions should, therefore, be reversed. We disagree.

■ When a jury asks a question regarding some element of the offense charged, the judge has an obligation to clarify that matter for the jury in a concrete and unambiguous manner. *Leonardo v. People,* 728 P.2d 1252, 1256 (Colo.1986).

■ Active participation in the preparation of a response to a jury question, or express agreement with it, bars the participant from arguing that the response constitutes error. *See People v. Rivers,* 70 P.3d 531, 534 (Colo.App.2002); *People v. White,* 64

P.3d 864, 875 (Colo.App.2002); *People v. Bielecki,* 964 P.2d 598, 608 (Colo.App.1998).

Section 18–1–503(4), C.R.S.2006, provides: When a statute defining an offense prescribes as an element thereof a specified culpable mental state, that mental state is deemed to apply to every element of the offense unless an intent to limit its application clearly appears.

*See People v. Coleby,* 34 P.3d 422, 424 (Colo. 2001).

In jury instruction 14, the trial court instructed the jury, in pertinent part, that the elements of the crime of theft were as follows:

(1) That the Defendant,

(2) In the State of Colorado, on or between the dates charged,

(3) knowingly,

  a. obtained or exercised control over,

  b. anything of value,

  c. which was the property of another,

  d. without authorization, or by deception, and either

    i. with intent to permanently deprive the other of the use or benefit of the thing of value, or

    ii. knowingly used or concealed the thing of value in such manner as to deprive the other permanently of the use and benefit of the thing of value ...

It is conceded that this instruction tracked the language of § 18–4–401(1), C.R.S.2006, and was a correct statement of the law.

During deliberations, the jury asked the following question, "In regards to Instruction 14(3)(d)(ii), would the statement convey the same meaning if the word 'knowingly' was inserted as follows: 'knowingly used or concealed the thing of value in such manner as to [knowingly] deprive the other permanently of the use and benefit of the thing of value' ... ?"

The trial court discussed the jury's question with counsel for both parties and sought their views on the appropriate response. Defense counsel responded, "The answer has to be yes. I'm asking and urging the Court to provide that answer because that's the law."

The trial court initially indicated it was inclined to refer the jury back to the "knowingly or willful instruction, because it answers the question." .

In response, defense counsel argued further that "you have to knowingly deprive the other permanently of the benefit and value." Defense counsel then stated, "... I think the Court should answer the question and say either yes, or as you just indicated on the record, that you have to be—I'm pulling out a phrase, practically certain your conduct will deprive the other permanently of the use and benefit of the thing of value. *So I'm ok with either one.*" (Emphasis added).

After further discussion with counsel, the court gave the following answer to the jury:

  Please refer to the culpable mental state instruction (# 16) and the definition of knowingly and willfully; this definition addresses both the person's "conduct" and the "result of his conduct."

Defense counsel stated that this answer was "fine."

In our view, the record shows that the trial court did exactly what defendant requested. The response that the trial court gave told the jury that culpable mental state applied both to defendant's conduct of using or concealing a thing of value and to the result of depriving another permanently of the use and benefit of the thing of value.

Accordingly, because defendant actively participated in preparing the response to the jury's question, and, indeed, expressly agreed to it, defendant cannot now complain that the response was improper. *See People v. Rivers, supra; People v. White, supra.*

## V. COCCA

Defendant contends that the erroneous exclusion of evidence in connection with the predicate convictions for securities fraud and theft necessarily requires reversal of the COCCA conviction. Because we have concluded that there is no reversible error with respect to the underlying predicate act convictions, we reject defendant's contention and conclude that there is no basis for reversal of the COCCA conviction.

## VI. Sentencing

Defendant challenges several aspects of his sentencing. We disagree with each of his contentions, and we affirm the sentences imposed by the trial court.

### A. Double Jeopardy

Defendant contends that securities fraud and theft are lesser-included offenses of COCCA; that, therefore, the trial court violated his constitutional right to be free from double jeopardy, because it entered judgment of conviction for violating COCCA as well as for committing securities fraud and theft; that his convictions for securities fraud and theft should merge into his COCCA conviction; and that the securities fraud and theft convictions should be vacated. We disagree.

■ Subject to constitutional limitations, it is the prerogative of the legislature to define crimes and prescribe punishments. *People v. Abiodun*, 111 P.3d 462, 464 (Colo. 2005). Under the Double Jeopardy Clauses of both the United States and Colorado constitutions, the state may not punish a person twice for the same offense. U.S. Const. Amend. V; Colo. Const. art. II, § 18; *Patton v. People*, 35 P.3d 124, 128–29 (Colo.2001). However, the Double Jeopardy Clauses do not prevent the legislature from specifying multiple punishments based upon the same criminal conduct. *Patton v. People, supra.* "As long as the general assembly makes clear its intent to punish the same offense with more than one conviction and sentence, it is not constitutionally prohibited from doing so." *People v. Abiodun, supra*, 111 P.3d at 465; *Meads v. People*, 78 P.3d 290, 293 (Colo.2003) (upon a clear showing of legislative intent, the General Assembly is free to authorize multiple punishments based upon the same criminal conduct without offending the Double Jeopardy Clause).

We conduct a two-part inquiry in this regard. First, did the General Assembly clearly authorize separate punishments for securities fraud or theft and for violations of COCCA? Second, if there was no such express authorization, are these offenses otherwise sufficiently distinguishable to permit multiple punishments? *See Patton v. People, supra*, 35 P.3d at 129; *see also Meads v. People, supra*, 78 P.3d at 293 (if the legislative intent to create separate offenses is clear from the face of the statute or the legislative history, our inquiry ends.).

■ Whether the General Assembly clearly authorized separate punishments for these crimes is an issue of first impression in Colorado. We conclude that it did.

COCCA was adopted by the General Assembly in 1981. Colo. Sess. Laws 1981, ch. 229, § 18–17–101 et seq. at 101–525; *see People v. Chaussee*, 880 P.2d 749, 753 (Colo. 1994). "In general, it was patterned after the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 (1988 & 1993 Supp.), commonly referred to as RICO, passed by the United States Congress in 1970." *People v. Chaussee, supra.*

■ Absent a prior interpretation by our state courts, federal case law construing the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961, et seq. (1988), is instructive because COCCA was modeled after the federal act. *Ferris v. Bakery, Confectionery & Tobacco Union*, 867 P.2d 38, 46 (Colo.App.1993); *see Tallitsch v. Child Support Servs., Inc.*, 926 P.2d 143, 147 (Colo.App. 1996).

COCCA is prefaced by a detailed statement of legislative purpose in § 18–17–102, C.R.S.2006, which provides in pertinent part:

[T]he general assembly declares that it is the purpose of this article to seek the eradication of organized crime in this state by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.

The General Assembly further provided, "[t]o effectuate the intent and purpose of this article, the provisions of this article shall be liberally construed." Section 18–17–108, C.R.S.2006.

This legislative declaration closely parallels the Statement of Findings and Purpose that introduces the Federal Organized Crime Control Act of 1970, of which RICO is a part.

*See* Pub.L. No. 91–452, 84 Stat. 922, 922–23 (1970); *see also People v. Chaussee, supra,* 880 P.2d at 754; 18 U.S.C. § 1961 note (2006).

Congress stated its intentions in this Statement of Findings and Purpose as follows:

It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.

Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 923 (1970); *see United States v. Hampton,* 786 F.2d 977, 980 (10th Cir.1986). Congress also included in its Statements of Findings and Purpose, "The provisions of this title ... shall be liberally construed to effectuate its remedial purposes." Pub.L. 91–452 § 904(a).

Relying on this congressional statement of purpose, the federal circuit courts of appeal have uniformly held that Congress intended that a RICO violation is a discrete offense that can be prosecuted and punished separately from its underlying predicate offenses. *See United States v. Crosby,* 20 F.3d 480 (D.C.Cir.1994); *United States v. Morgano,* 39 F.3d 1358 (7th Cir.1994); *United States v. Beale,* 921 F.2d 1412 (11th Cir.1991); *United States v. Kragness,* 830 F.2d 842 (8th Cir. 1987); *United States v. Grayson,* 795 F.2d 278 (3d Cir.1986); *United States v. Hampton, supra; United States v. Truglio,* 731 F.2d 1123 (4th Cir. 1984)(rev'd on other grounds by United States v. Burgos, 94 F.3d 849 (4th Cir.1996)); *United States v. Sutton,* 700 F.2d 1078 (6th Cir.1983); *United States v. Greenleaf,* 692 F.2d 182 (1st Cir.1982); *United States v. Hawkins,* 658 F.2d 279 (5th Cir.1981); *United States v. Boylan,* 620 F.2d 359 (2d Cir.1980); *United States v. Rone,* 598 F.2d 564 (9th Cir.1979).

In so holding, the federal courts have recognized that "[t]he language and legislative history of RICO indicates little doubt that Congress, in enacting RICO, sought to allow the separate prosecution and punishment of predicate offenses and a subsequent RICO offense." *United States v. Grayson, supra,* 795 F.2d at 282. As the Ninth Circuit has written in a much-quoted statement:

There is nothing in the RICO statutory scheme which would suggest that Congress intended to preclude separate convictions or consecutive sentences for a RICO offense and the underlying or predicate crimes which make up the racketeering pattern. The racketeering statutes were designed primarily as an additional tool for the prevention of racketeering activity, which consists in part of the commission of a number of other crimes. The Government is not required to make an election between seeking a conviction under RICO, or prosecuting the predicate offenses only. Such a requirement would nullify the intent and effect of the RICO prohibitions.

*United States v. Rone, supra,* 598 F.2d at 571; *see United States v. Grayson, supra,* 795 F.2d at 283; *United States v. Sutton, supra,* 700 F.2d at 1081 ("Cumulative sentences are the 'enhanced sanctions' which Congress deemed necessary to treat the spreading disease of organized crime. In fact, if cumulative convictions and sentences were disallowed by courts, Congress' purpose to eradicate organized crime would be thwarted because the RICO penalties are in many cases lighter than penalties for underlying offenses."); *United States v. Kragness, supra,* 830 F.2d at 864 ("Congress clearly intended to permit, and perhaps sought to encourage, the imposition of cumulative sentences for RICO offenses and the underlying crimes.").

Because COCCA's statement of legislative purpose is so similar to RICO's, we adopt the reasoning of these federal authorities and conclude that the General Assembly also intended the imposition of cumulative or multiple sentences. In our view, the General Assembly clearly expressed its intent to permit multiple punishments with sufficient clarity in its statement of purpose, set forth in § 18–17–102. Imposing "new penal prohibitions," "enhanced sanctions," and "new remedies" would be meaningless if a sentence for a COCCA conviction could not be imposed in addition to a sentence for a conviction of the underlying predicate offense.

Other statutory language compels the same conclusion. For example, RICO defines "pattern of racketeering activity" to include "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." *See* 18 U.S.C. § 1961(5). A number of federal circuit courts have found that this statutory language suggests that Congress expressly contemplated that a RICO defendant might be incarcerated for one or more of the predicate offenses before being prosecuted for the RICO violation. *United States v. Crosby, supra,* 20 F.3d at 484; *United States v. Grayson, supra,* 795 F.2d at 282.

Similarly, the General Assembly defined a "pattern of racketeering activity" in COCCA as:

> engaging in at least two acts of racketeering activity which are related to the conduct of the enterprise, if at least one of such acts occurred in this state after July 1, 1981, and if the last of such acts occurred within ten years (excluding any period of imprisonment) after a prior act of racketeering activity.

§ 18–17–103(3), C.R.S.2006.

Because COCCA defines a pattern of racketeering activity in almost identical language to RICO, this suggests that the General Assembly likewise contemplated that a COCCA defendant might be incarcerated for a predicate offense before being prosecuted for the COCCA violation.

We also note that COCCA is an entirely separate article within the Colorado Criminal Code, addressing a new and different crime, with its own statement of intent. This separate enactment, in addition to the legislative purpose language of § 18–17–102, demonstrates that the General Assembly intended to punish the same conduct with more than one conviction and sentence. *See People v. Abiodun, supra,* 111 P.3d at 465 (where, as here, "the general assembly proscribes conduct in different provisions of the penal code and identifies each provision with a different title, its intent to establish more than one offense is generally clear"); *see also People*

*v. Pollard,* 3 P.3d 473 (Colo.App.2000)(defendant convicted of one count of COCCA and four counts of theft and criminal impersonation); *People v. Upshur,* 923 P.2d 284, 285 (Colo.App.1996) (defendant convicted of COCCA, conspiracy to violate COCCA, and predicate offenses of theft and second-degree forgery).

We also find it instructive that a number of state appellate courts, in analyzing their state's RICO statutes, have followed federal authority and found a clear legislative intent to authorize multiple punishments. *See Carroll v. State,* 459 So.2d 368, 369 (Fla.Dist.Ct. App.1984); *Chavez v. State,* 722 N.E.2d 885, 894–94 (Ind.Ct.App.2000)("[W]e cannot logically conclude that the legislature meant to *substitute* the RICO offense for the underlying predicate offenses rather than to permit prosecution for RICO in addition to prosecution for the predicate offenses."); *Dellenbach v. State,* 508 N.E.2d 1309 (Ind.Ct.App.1987)(defendants convicted of state RICO violations and underlying counts of theft for defrauding elderly homeowners); *State v. Reed,* 618 N.W.2d 327 (Iowa 2000); *State v. Bailey,* 713 So.2d 588 (La.Ct.App.1998)(holding that double jeopardy did not apply because the legislature expressed a clear intent to increase punishment for individual crimes where a pattern of criminal activity was proven, and relying on federal RICO cases; despite lack of purpose statement in La.R.S. 15:1351); *Commonwealth v. Besch,* 418 Pa.Super. 576, 614 A.2d 1155, 1158–59 (1992) *(rev'd in part on other grounds by Commonwealth v. Besch,* 544 Pa. 1, 674 A.2d 655 (1996) (when legislature intended to provide new remedies and procedures, it would be unreasonable to assume legislature did not intend for defendants to be sentenced for both violating corrupt organizations statute and for predicate acts, because otherwise defendant whose predicate acts involved murder would be sentenced the same as similarly situated defendant whose predicate acts involved gambling)). *But see Reina v. State,* 940 S.W.2d 770 (Tex.Ct.App.1997)(reaching the same conclusion, but on the basis of Tex. Penal Code Ann. § 71.03(3) (West 2006), explicitly providing for cumulative punishment).

Defendant points to the language in RICO's Statement of Findings and Purpose that "[n]othing in this title shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this title." Pub.L. 91–452 § 904(b). Defendant correctly asserts that COCCA does not contain similar language in its state of legislative purpose. However, we reject defendant's contention that COCCA, therefore, does not clearly articulate a legislative intent to authorize multiple punishments for COCCA violations and the underlying predicate offenses. Many of the federal circuit cases do not even rely on the language in § 904(b) to support their holding that Congress intended to authorize multiple punishments. *See, e.g., United States v. Crosby, supra; United States v. Grayson, supra; United States v. Boylan, supra; United States v. Rone, supra.* Other courts have referred to this language as merely a "further elaborat[ion]" of Congress' intent. *United States v. Sutton, supra,* 700 F.2d at 1081; *see United ed States v. Hawkins, supra,* 658 F.2d at 288 (evidence of Congress' intent also found in section 904(b)); *see also Dellenbach v. State, supra* (interpreting Indiana RICO statute, which has neither statement of purpose nor language equivalent to § 904(b), and concluding that, because Indiana RICO laws were patterned after federal RICO laws, and because federal courts have held that convictions for both RICO violation and predicate offenses do not violate double jeopardy, there was a clear indication of Indiana legislative intent to allow cumulative punishment).

We also reject defendant's contention that, notwithstanding the General Assembly's clear legislative intent to authorize multiple punishments, we must still conduct a lesser included offense analysis under § 18–1–408, C.R.S.2006, which provides in pertinent part:

(1) When any conduct of a defendant establishes the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not be convicted of more than one offense if:

(a) One offense is included in the other, as defined in subsection (5) of this section . . .

This statute is considered to be Colorado's version of the so-called *Blockburger* test, which provides, "[t]he test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *People v. Abiodun, supra,* 111 P.3d at 465.

■ However, the *Blockburger* rule is applied "as a rule of statutory construction to help determine legislative intent" and "is not controlling when the legislative intent is clear from the face of the statute or the legislative history." *Garrett v. United States,* 471 U.S. 773, 778–79, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985); *See United States v. Crosby, supra,* 20 F.3d at 484 n. 9; *United States v. Grayson, supra,* 795 F.2d at 282; *see also Carroll v. State, supra,* 459 So.2d at 369 ("even if the crimes are the same under *Blockburger,* if it is evident that the legislature intended to authorize cumulative punishments, judicial inquiry is at an end"); *Chavez v. State, supra* (concluding that regardless of double jeopardy analysis mandated by Indiana Constitution, a defendant may be convicted of both a RICO violation and of its predicate offenses). In our view, § 18–1–408 is meant to be applied only when there is no clear legislative intent providing for cumulative punishments. *See Meads v. People, supra; Patton v. People, supra.*

Because we conclude that the General Assembly clearly authorized separate punishments for COCCA and the underlying predicate offenses of theft and securities fraud, we need not conduct a strict elements analysis under § 18–1–408, nor do we need to address the parties' other contentions concerning the Double Jeopardy and merger issues.

## B. Length of Sentence

■ Defendant contends that the trial court abused its sentencing discretion by imposing a total prison sentence of one hundred years. He argues that the sentence was

extraordinary and unprecedented for a non-violent offender with no prior criminal record and does not serve the purposes of the Colorado Criminal Code. We disagree and perceive no abuse of discretion in the sentence imposed by the trial court.

The purposes of the Criminal Code with respect to sentencing are as follows:

(a) To punish a convicted offender by assuring the imposition of a sentence he deserves in relation to the seriousness of his offense;

(b) To assure the fair and consistent treatment of all convicted offenders by eliminating unjustified disparity in sentences, providing fair warning of the nature of the sentence to be imposed, and establishing fair procedures for the imposition of sentences;

(c) To prevent crime and promote respect for the law by providing an effective deterrent to others likely to commit similar offenses; and

(d) To promote rehabilitation by encouraging correctional programs that elicit the voluntary cooperation and participation of convicted offenders.

Section 18–1–102.5(1), C.R.S.2006; *See People v. Madril,* 746 P.2d 1329, 1336–37 (Colo. 1987).

Because sentencing requires familiarity with the circumstances of a case, a trial court's sentencing decision will not be disturbed absent a clear abuse of discretion. *People v. Leske,* 957 P.2d 1030, 1042 (Colo. 1998). A sentencing court abuses its discretion if it fails to consider the nature of the offense, the character and rehabilitative potential of the offender, the development of respect for the law and the deterrence of crime, and the protection of the public. *People v. Leske, supra,* 957 P.2d at 1043; *People v. Fuller,* 791 P.2d 702, 708 (Colo.1990); *see State v. Heywood,* 245 Kan. 615, 783 P.2d 890, 894 (1989)("[D]iscretion is abused only where no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.").

A defendant convicted of a felony has the statutory right to one appellate review of the sentence imposed by the trial court. *People v. Leske, supra; see* § 18–1–409(1), C.R.S.2006. "Like the trial court, the appellate court must consider the offender's character, the public interest, and the nature of the offense in reviewing the sentencing decision." *People v. Leske, supra,* 957 P.2d at 1043.

The sentencing court must "state on [the] record the basic reasons for imposing the sentence." *People v. Watkins,* 200 Colo. 163, 168, 613 P.2d 633, 637 (1980). If the sentence is within the range required by law, is based on appropriate considerations as reflected in the record, and is factually supported by the circumstances of the case, an appellate court must uphold the sentence. *People v. Fuller, supra.* Indeed, "only in truly exceptional circumstances will an appellate court substitute its judgment for the judgment of the trial court as to the appropriate sentence." *People v. Cole,* 926 P.2d 164, 169 (Colo.App.1996).

Here, a review of the record shows that the sentencing court engaged in a careful analysis of the pertinent factors, arrived at a sentence that was consistent with the purposes of the Criminal Code with respect to sentencing, and articulated on the record its basic reasons for imposing the sentence. *See People v. Madril, supra,* 746 P.2d at 1337.

The trial court stated that it had read and re-read both the victim impact statements and various letters submitted on defendant's behalf. Acknowledging that there was an outpouring of assertions and testimonials on defendant's behalf, the trial court nevertheless found that their content was negated by the evidence presented during the trial and by the jury's findings. The trial court also considered defendant's own statements at the sentencing hearing, including his statement that he wanted to pay back his creditors and his request to stay out of prison so he could go back to work for that purpose.

The trial court found that defendant had repeatedly violated the trust and financial security of many people and had manipulated their money, their emotions, and their judg-

ment. The trial court stated, "The ripple effect of your actions ... [is] truly incalculable and irreparable."

The trial court further stated on the record that the three compelling sentencing considerations in this case were the sheer number of named victims, the duration and extent of defendant's schemes over a period of years, and the depth of his deceptions.

The trial court acknowledged that the sentences it imposed "must be proportionate to the gravity of the offense and must effectuate the jury's verdict." The trial court also acknowledged and took into consideration the fact that defendant had no prior criminal record.

The trial court specifically found that it could not rely on the promises and representations of someone who had been found by the jury to be a thief and a liar, and the court, therefore, rejected defendant's arguments that he should not serve a prison sentence so that he could go back to work and earn money to pay restitution to his victims.

The presumptive sentencing range for each of defendant's convictions for theft and securities fraud was four to twelve years. *See* § 18-1.3-401(1)(a)(V)(A), C.R.S.2006. The trial court imposed a total prison sentence of 100 years. In reaching this figure, the trial court imposed the minimum sentence of four years for each theft and securities fraud conviction. Where defendant had been convicted of both securities fraud and theft with respect to a particular victim, the trial court imposed a four-year sentence on the theft charge, to run consecutively with all other sentences, and four years on the corresponding securities charge, to run concurrently with the theft charge. Where there was only one conviction with respect to a particular victim, the trial court imposed a single four-year sentence, to run consecutively with all other sentences. In total, there were twenty-five consecutive four-year sentences, one for each of the twenty-five victims, and eighteen concurrent four-year sentences. The trial court also imposed a concurrent sentence of twenty-four years on the COCCA conviction, which was the maximum in the presumptive range for that offense.

In imposing these sentences, the record shows that the trial court considered the nature of the offenses, the defendant's character, and the public interest. As noted, the court also considered and rejected defendant's argument that he should not be sent to prison, specifically finding his statements not credible.

In effect, the trial court imposed one minimum four-year consecutive sentence for either a fraud or a theft perpetrated on each of the twenty-five named victims. The fact that the total sentence was 100 years was due to the large number of victims covered by the indictment. *See People v. Hogan*, 114 P.3d 42 (Colo.App.2004) (when multiple victims are involved, the court has discretion to impose consecutive sentences); *see also Close v. People*, 48 P.3d 528, 538-39 (Colo.2002)(in proportionality review, the reviewing court looks separately at each sentence imposed rather than at the cumulative total, and a severe punishment resulting from a large number of crimes does not raise proportionality concerns).

We reject defendant's reliance on *People v. Edwards*, 198 Colo. 52, 598 P.2d 126 (1979). In that case, the supreme court reversed two consecutive ten to fourteen year sentences for heroin trafficking. However, in *Edwards*, the offenses were a series of sales to a single undercover agent within a very brief period of time, the sentences substantially exceeded the minimum recommended sentence, and the trial court explicitly refused to consider the factor of rehabilitation. Here, the trial court considered defendant's prior good record, while rejecting his assertions that he was a changed man, and it based a series of minimum four-year sentences on the sheer number of victims and the depth and extent of defendant's deceptions over a period of approximately five years.

Similarly, defendant's reliance on *People v. Martinez*, 628 P.2d 608 (Colo.1981), is misplaced. In *Martinez*, the defendant challenged as excessive his concurrent sentences of twenty-one years and seven months to twenty-five years for second-degree burglary, and six months for misdemeanor theft of

property with a value of less than fifty dollars. The record showed that the defendant's convictions were based on evidence that he entered a building and stole a sleeping bag, jewelry, and clothes of a total value less than fifty dollars, and that all the property was recovered and returned to the victim. The supreme court specifically did not hold that the sentences were inappropriate. Rather, the court vacated the sentences and remanded for resentencing only because it was unable to evaluate the appropriateness of the sentences fairly on the basis of the record before it. Specifically, the supreme court found that the trial court "did not make findings with respect to the seriousness of the offense for which the sentence was imposed or concerning the seriousness of the prior offenses as to which the judge had information." *See People v. Martinez, supra*, 628 P.2d at 613. Here, by contrast, the record contains substantial information about the nature and scope of defendant's criminal activities, and the trial court made detailed and explicit findings on the record with respect to the seriousness of the offenses for which sentences were imposed. Accordingly, unlike the situation in *Martinez*, we are able "to make an informed review directed to each of the relevant sentencing considerations." *See People v. Martinez, supra.*

 Finally, we are not persuaded by defendant's references in his briefs on appeal to lesser prison sentences given to other defendants convicted of "white-collar" crimes. In an extended proportionality review, where a defendant challenges the proportionality of his or her sentence on constitutional grounds, a court compares the defendant's sentence to sentences imposed on those who committed the same crime, both in this jurisdiction and in other jurisdictions. *See People v. Deroulet*, 48 P.3d 520, 524 (Colo.2002); *People v. McNally*, 143 P.3d 1062 (Colo.App.2006). Here, however, we are not called upon to conduct an extended proportionality review, and the issue is whether the trial court abused its discretion by imposing the twenty-five con-

secutive sentences under its statutory sentencing authority. On the record before us, we discern no abuse or discretion.

In sum, we conclude that there was no abuse of discretion in the sentences imposed by the trial court. The trial court considered all appropriate factors and standards in its sentencing decision, and, in our view, a total sentence of 100 years is not an abuse of discretion under all the circumstances of this case. Accordingly, because the record establishes a clear justification for the sentence imposed, we will not disturb it on appeal.

The judgment and sentences are affirmed.

Judge ROMÁN and Judge PLANK * concur.